Filed 6/25/13

CERTIFIED FOR PUBLICATION

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E054160 |
| v. | (Super.Ct.No. RIF149998) |
| ALLAN CORRAL HERNANDEZ, | O P I N I O N |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. Gary B. Tranbarger, Judge. Affirmed in part and reversed in part.

Robert L.S. Angres, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Steve Oetting and Andrew Mestman, Deputy Attorneys General, for the Plaintiff and Respondent.

## I. INTRODUCTION

Defendant and appellant Allan Corral Hernandez was convicted by a jury of battery of a cohabitant (Pen. Code, § 243, subd. (e)(1); count 1),[1] intimidation of a witness (§ 136.1, subd. (b); count 3), unlawful possession of a firearm following a felony conviction (§ 12021, subd. (c)(1); count 5),[2] and unlawful possession of ammunition (§ 12316, subd. (b)(1); count 6).[3] In a bifurcated proceeding, the trial court found that defendant had a one-year prior prison conviction, two prior serious felony convictions, and two prior strike convictions. (§§ 667, subds. (a), (e)(2)(A), 667.5, subd. (b), 1170.12, subd. (c)(2)(A).)

Defendant was sentenced to 25 years to life on each of counts 3, 5, and 6, plus one year on count 1. The sentences on counts 1 and 5 are to run consecutive to the sentence on count 3; the sentence on count 6 is to run concurrent to the sentence on count 5.

Defendant appeals his convictions on counts 5 and 6 for unlawful possession of a firearm and ammunition. Defendant argues that the evidence presented at trial revealed two plausible instances in which he could have been in possession of a firearm and ammunition. He further argues that each instance was separated by time and space, and a different defense was proffered as to each instance of possession. At trial, the prosecutor

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Section 12021, subdivision (c)(1) has since been recodified as section 29800.

[3] Section 12316, subdivision (b)(1) has since been recodified as section 30305, subdivision (a)(1).

2

failed to elect which instance of possession he was using to prove the charged offenses and the trial court did not, sua sponte, give a unanimity instruction to the jury.

We find that defendant's arguments on appeal are meritorious and hold that the trial court's failure to give a unanimity instruction was error. We further hold that the error was not harmless. Accordingly, the judgment of the trial court as to counts 5 and 6 is reversed.

## II. FACTS

A. *The Events of April 5, 2009*

In April 2009, defendant lived with his girlfriend, Jane Doe, in her house. On the afternoon of April 5, 2009, an oral argument between defendant and Doe turned violent. A physical altercation ensued, in which defendant allegedly choked Doe. The police were called, and defendant fled the scene in a gold-colored Toyota Camry. When the police arrived, Doe told a responding officer that a domestic violence altercation had occurred between she and defendant, and that defendant had attacked her. Thereafter, Doe and defendant ceased living together.

Between April 5, 2009 and April 8, 2009, defendant called and text-messaged Doe on more than 20 occasions, insisting that she alter her story regarding the domestic violence incident. Defendant demanded that Doe tell the police that she, not he, was the one who started the violence between them.

3

B. *The Stop of the White Oldsmobile at Midnight on April 8, 2009*

In the early evening hours of April 8, 2009, Doe observed a white Oldsmobile drive past her house two or three times. While Doe found it odd that the car repeatedly passed her house, she did not report this suspicious activity to the police.

Coincidentally, at approximately midnight that evening, Riverside Police Officer Darrell Hill stopped a white Oldsmobile for a traffic violation near Doe's home. The Oldsmobile was being driven by defendant's friend, Chadwick Miller, and defendant was a passenger in the vehicle. Because Miller and defendant were both on parole at that time, Officer Hill detained them and conducted a routine search of their persons and of the Oldsmobile. Officer Hill detained defendant and Miller for approximately 45 minutes; the search of the car lasted approximately 20 minutes. Officer Hill did not find any firearms, ammunition, or ammunition containers.

Officer Hill testified he did not remember whether he searched under the hood of the Oldsmobile. However, Miller testified that Officer Hill searched "[e]verywhere." When asked at trial if Officer Hill searched underneath the hood of the Oldsmobile, Miller reiterated that he searched "[e]verywhere," insinuating that the engine compartment was also searched. Officer Hill's search did not yield any contraband, and both men were released.

C. *The Shooting at Doe's Home on April 8, 2009*

After Officer Hill released them, defendant and Miller continued on to Doe's home, which was within two miles from where Officer Hill had stopped them. The

4

witness testimony presented at trial about what occurred at Doe's home that night was riddled with inconsistencies.

The prosecution relied on Doe's testimony to describe the events of that evening. Doe testified that she was inside the home with her friend, Irene Perez, and a family member, Ernie Fuentes.[4] Doe, Perez, and Fuentes heard a noise outside, and Perez saw someone move across the front yard. Using a video surveillance system, Doe saw two shadows and then saw defendant appear at her front door.[5]

Doe gave conflicting testimony about what she observed in defendant's hands when he approached her front door. On direct examination, Doe positively identified the type of gun defendant had in his hands as an eight-inch revolver; when shown a photograph of a gun later recovered by the police in a car driven by defendant, Doe stated that it was the gun defendant had that night. Doe further testified that as Fuentes looked outside he stated that defendant had a gun. Doe later testified, however, that she *only* saw something "shiny" in defendant's hands when he approached her front door. She denied being able to see a gun clearly that night, conceding that "[i]t was hard to see," and that she could "just see, like, shiny parts" from her vantage point. On cross-examination, Doe

---

[4] Ernie Fuentes also goes by the nickname "Scooby," and was intermittently referred to as both Ernie and Scooby during defendant's trial.

[5] The video surveillance system did not have a recording apparatus. The camera captured footage of the front of the house, which was displayed on a monitor in Doe's bedroom.

admitted she never actually saw a gun that night, and reaffirmed that she only saw the "shiny" object.

After defendant repeatedly demanded that he be allowed to speak to Doe, Perez called the police. When defendant learned that Perez had made a 911 call, he left the front door and moved to the side of the house. Subsequently, Doe, Fuentes, and Perez heard "popping" noises, consistent with the sound of gunfire, emanating from the side of the house. Lastly, Doe testified that she knew defendant did not generally carry a weapon.

During the 911 call, Perez told the dispatcher that defendant had fired a gun at the residence and tried to break into the house. At trial, she testified that this was not true, and that she had given false information to the 911 dispatcher. Deputy Christian Wilcox testified that upon responding to the 911 call, he inspected the premises. He saw no evidence that a gun had been fired.

The defense's account of the events that night were significantly different. Defendant claimed he did not have a firearm when he went up to Doe's door. In support of this contention, defendant relied on the testimony of Miller and Perez.

Miller testified that neither he nor defendant possessed a firearm that night. Although he had been driving his white Oldsmobile with defendant that night, they had not driven past Doe's home earlier in the day. After Officer Hill had stopped them, they continued on to Doe's house because defendant wanted to retrieve some clothing he had left at the house. When they arrived at Doe's house, defendant went up to the door to

6

speak with Doe, while Miller remained alongside his car. Miller then heard gunshots emanating "pretty close" to the "house area." He then told defendant they needed to "get out of [t]here," because he and defendant were on parole. They got into the Oldsmobile and left the scene.

Perez's testimony also countered the prosecution's theory of the events of April 8, 2009. She testified that she and Doe were up late that night using methamphetamine in Doe's room. Through the surveillance camera, she saw defendant "show up" with Miller. Thereafter, defendant knocked on a window in an attempt to speak with Doe. In contrast to Miller's testimony, Perez testified that both defendant and Miller came up to the front door. When questioned about whether defendant had anything in his hands while he was at the front door, Perez stated she did not see a gun in defendant's hand when he came to the door; rather, she saw a "couple beers" in his hands.

Perez testified she *did* see guns that night, *but* the guns were possessed by Doe and Fuentes. According to Perez, defendant demanded to be let into Doe's home. After defendant made this demand, Doe instructed Fuentes to retrieve "the guns." Fuentes obliged, and soon had two guns in his possession. He gave a gun to Doe, and she loaded the gun. Fuentes went to the patio door and fired the gun in defendant's direction, as defendant was leaving.

When police arrived at Doe's home, Doe reported that she thought someone had shot at her home. However, no bullet holes or strike marks were found on Doe's property. At approximately 1:00 a.m., police dispatchers alerted patrol officers of the

7

shooting. The dispatcher informed patrol officers to be on the lookout for the Oldsmobile and possibly a gold Toyota Camry.

D. *The Stop of the Gold Camry on April 8, 2009*

After defendant and Miller left Doe's house, they drove approximately 15 minutes away to retrieve the gold Camry. They discussed going to a motel room in Corona, where Miller's girlfriend was staying. Defendant was to follow Miller to Corona. Prior to leaving for Corona, they stopped at a fast food restaurant in Riverside.

Meanwhile, at approximately 1:14 a.m., Officer Hill (who had detained Miller and defendant earlier that evening) learned of the incident at Doe's home. Approximately one hour later, Officer Hill saw a gold Camry matching the description in the dispatch call, and stopped the vehicle as it pulled into a gas station parking lot. Defendant was alone inside the Camry. Other officers stopped Miller's Oldsmobile, which was located near the Camry. Both vehicles were searched. Nothing was found in Miller's Oldsmobile.

However, a search of the Camry revealed the presence of a .44 Charter Arms handgun, wrapped in a black T-shirt, in the Camry's engine compartment. The cylinder of the revolver was fully loaded, containing five bullets. Defendant was arrested.

E. *Other Testimony and Evidence Presented at Trial*

At trial, the prosecution did not present any direct evidence that defendant owned the Camry. However, Doe testified that the Camry was the car defendant normally drove. No other evidence was presented as to whether defendant had dominion and

8

control of the revolver found in the Camry. Rather, the prosecutor used circumstantial evidence to demonstrate that the Camry was the car defendant was known to use, and that the gun was found under the hood of the car at the time defendant was driving the car.

Evidence of jailhouse communications between defendant and Doe during defendant's incarceration were also introduced at trial. In these communications, defendant states that someone named "Angel" would take responsibility for the presence of the gun underneath the hood of the Camry.

F. *Prosecutor's Closing Arguments*

During closing arguments, the prosecutor referred to defendant's possession of the firearm at Doe's home and his possession of the fully loaded firearm found under the hood of the Camry. The prosecutor never elected which of these two incidents was the basis for the possession of firearms and ammunition charges.

During the prosecutor's argument regarding count 5 (felon in possession of a firearm), the prosecutor began by referring to the Camry and the recovery of the fully loaded revolver from underneath the hood. He argued that the Camry was defendant's car as it was the vehicle he used when leaving Doe's house after the domestic violence incident and the same vehicle he was known to use. Immediately thereafter, the prosecutor referred to Doe's testimony that she believed defendant had a revolver in his hand outside of her home when the shooting occurred. The prosecutor *then* referred back to the location of the gun underneath the Camry's hood, arguing that defendant hid the revolver there after he fired the shots at Doe's home.

9

## G. *Defendant's Closing Arguments*

In his closing argument, defense counsel stressed two defenses to counts 5 and 6. First, he argued defendant did not have a gun when he was outside of Doe's home; second, he argued there was no evidence that the Camry was his and, therefore, he did not have the requisite dominion and control over the firearm.

The defense relied on Officer Hill's search prior to the shooting to prove that defendant did not have a gun at Doe's home. The defense referenced Officer Hill's search of defendant, Miller, and the Oldsmobile, which proved to be fruitless. Further, the defense also referenced Doe's testimony that defendant had something "shiny" in his hands, arguing that this was not evidence that defendant had a gun.

As to the gun found under the hood of the car, the defense asserted that there was no proof that defendant owned the Camry, no evidence was submitted as to how long defendant had been driving the Camry, how often he drove it, or who else drove it. Further, the defense argued that defendant's fingerprints or DNA were not on the gun. Thus, the defense argued, defendant did not have sufficient dominion and control of the weapon.

The defense also made the argument that the gun used during the shooting could not have been the same gun as the one found in the Camry because the gun in the Camry was fully loaded, no shell casings were found, and no ammunition boxes or other evidence defendant had reloaded the gun were present.

The prosecution never elected which acts constituted possession of the firearm and ammunition, and the trial court did not give the jury a unanimity instruction.

## III.  ANALYSIS

On appeal, defendant raises two issues.  First, defendant contends the trial court should have stayed his sentence for unlawful possession of ammunition under section 654 because the possession was concurrent with his possession of the gun.  Second, defendant contends the trial court erred in failing to administer, sua sponte, a unanimity instruction because the record reveals two separate instances of conduct regarding possession of the firearm and ammunition, rather than one discrete act or transaction.  Defendant further contends that the error was prejudicial under both *Chapman*[6] and *Watson*[7] standards for harmless error.  We agree, and therefore reverse defendant's convictions for unlawful possession of a firearm and ammunition.  Because we conclude that defendant's convictions for unlawful possession of a firearm and ammunition must be reversed, we do not reach the first issue on appeal.

A.  *The Trial Court's Failure to Give a Unanimity Instruction Sua Sponte Was Error*

    1.  <u>Standard of Review</u>

Defendant argues the trial court committed reversible error when it failed to deliver a unanimity instruction to the jury.  "[A]ssertions of instructional error are reviewed de novo."  (*People v. Shaw* (2002) 97 Cal.App.4th 833, 838.)  Whether or not

---

[6]  *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*).

[7]  *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*).

11

the trial court should have given a "particular instruction in any particular case entails the resolution of a mixed question of law and fact," which is "predominantly legal." (*People v. Waidla* (2000) 22 Cal.4th 690, 733.) As such, it should be examined without deference. (*Ibid.*)

2. The Trial Court Must Give a Unanimity Instruction Sua Sponte When the Defendant's Conviction May Be Based on More Than One Act and the Prosecution Fails to Elect Which Course of Conduct Constitutes the Charged Offense

In California, a jury verdict in a criminal case must be unanimous. (*People v. Collins* (1976) 17 Cal.3d 687, 693, citing Cal. Const., art. I, § 16.) Thus, our Constitution requires that each individual juror be convinced, beyond a reasonable doubt, that the defendant committed the *specific* offense he is charged with. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132 (*Russo*).) Therefore, when the evidence suggests more than one discrete crime, either: (1) the prosecution must elect among the crimes; or (2) the trial court must instruct the jury that it must unanimously agree that the defendant committed the same criminal act. (*Ibid.*; *People v. Brown* (1996) 42 Cal.App.4th 1493, 1499-500.) The unanimity instruction must be given sua sponte, even in the absence of a defense request to give the instruction. (*People v. Riel* (2000) 22 Cal.4th 1153, 1199; *People v. Carrera* (1989) 49 Cal.3d 291, 311, fn. 8.) Here, the Attorney General concedes there was not an election; hence, we address only the question of whether or not the trial court was required to give the instruction sua sponte.

12

A unanimity instruction is given to thwart the possibility that jurors convict a defendant based on different instances of conduct. The giving of CALJIC No. 17.01 (or a similar instruction) "'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.'"[8] (*Russo, supra,* 25 Cal.4th at p. 1132, quoting *People v. Sutherland* (1993) 17 Cal.App.4th 602, 612.) Moreover, a unanimity instruction is "'designed in part to prevent the jury from amalgamating evidence of multiple offenses, no one of which has been proved beyond a reasonable doubt, in order to conclude beyond a reasonable doubt that a defendant must have done *something* sufficient to convict on one count.'" (*Russo, supra,* at p. 1132.) Thus, the instruction is given to ensure that all 12 jurors unanimously agree, and are unanimously convinced beyond a reasonable doubt, which instance of conduct constitutes the charged offense.

The importance of the unanimity instruction is rooted in the Fourteenth Amendment to the United States Constitution's requirement that all criminal defendants are afforded due process of law. The failure to give a unanimity instruction "has the

---

[8] CALJIC No. 17.01 states: "The defendant is accused of having committed the crime of _____ [in Count ___]. The prosecution has introduced evidence for the purpose of showing that there is more than one [act] [or] [omission] upon which a conviction [on Count ___] may be based. Defendant may be found guilty if the proof shows beyond a reasonable doubt that [he] [she] committed any one or more of the [acts] [or] [omissions]. However, in order to return a verdict of guilty [to Count ___], all jurors must agree that [he] [she] committed the same [act] [or] [omission] [or] [acts] [or] [omissions]. It is not necessary that the particular [act] [or] [omission] agreed upon be stated in your verdict."

effect of lowering the prosecution's burden of proof." (*People v. Wolfe* (2003) 114 Cal.App.4th 177, 186 [Fourth Dist., Div. Two] (*Wolfe*).) Accordingly, a failure to give the instruction when it is warranted abridges the defendant's right to due process, as it runs the risk of a conviction when there is not proof beyond a reasonable doubt.

In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on *two discrete crimes* and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a *single discrete crime*. (*Russo, supra,* 25 Cal.4th at p. 1135, italics added.) In the first situation, but not the second, it should give the unanimity instruction. (*Ibid.*)

In *People v. Norman* (2007) 157 Cal.App.4th 460, the court held that a unanimity instruction was required in a prosecution for receiving stolen property after determining there were multiple discrete acts, any of which could have constituted the charged offense. (*Id.* at p. 465.) There, the defendant and a coconspirator were caught breaking into multiperson mailboxes at an apartment complex and stealing credit cards and ATM cards from those mailboxes. When authorities searched the vehicle the men were using at the time, they discovered additional pieces of mail that had been stolen from another mailbox, at another location, weeks earlier.

During closing arguments, the prosecutor in the *Norman* case "did not make an election as to which acts were to constitute the theft and, during closing argument to the jury, *specifically argued both* the theft of the mail in the car and the theft of the mail from

14

the apartment complex." (*People v. Norman, supra,* 157 Cal.App.4th at p. 465.) Counsel in *Norman* began closing argument by talking about possession of the stolen mail outside of the apartment complex; he then stated: "'*But also there is more mail here, the one— the mail that was found actually in the car.*'" (*Id.* at p. 466.) The court held that "the evidence supported more than one discrete crime of theft and the prosecution not only failed to elect among the crimes, but actually argued both to the jury. Accordingly, the trial court was required to instruct the jury sua sponte that it must unanimously agree on the criminal conduct supporting the conviction." (*Ibid.*)

The facts in the instant case are analogous to those in *Norman*. As stated above, the prosecutor never elected which of the two alleged gun possessions constituted the charged offense. Throughout the trial, the prosecutor introduced evidence supporting both instances of possession. During closing argument regarding count 5, the prosecutor first referenced the gun found in the Camry and argued to the jury that it was defendant's car and defendant's gun: "It was his car. Not under dispute. It was his vehicle, the vehicle that he had on the day of the domestic violence incident. The vehicle that he was pulled over in. The vehicle that [Doe] knows he uses." The prosecutor then referenced the incident at Doe's home: "Now, [Doe] also testified that the defendant had a gun three days later after the domestic violence incident on the 8th, and she described it as what she

believed was a revolver."[9] He then claims defendant "hid" the gun in the Camry, although no evidence was presented to establish that it was actually the same gun.

Thus, the prosecutor, like the prosecutor in *Norman*, argued both instances of possession to the jury. As demonstrated by the prosecutor's closing arguments, the evidence in this case was not indicative of one discrete act. Rather, the record reveals two discrete acts of possession, either of which could have constituted the charged offenses. First, the incident at Doe's house, in which defendant was alleged to have fired a firearm at Doe's home; and second, the incident later that evening in which the Camry was searched and a fully loaded firearm concealed in a black T-shirt was discovered.

On these facts, reasonable jurors could have divided on which instance of possession they used to convict defendant of the charged offenses. Some jurors may have believed defendant possessed only the firearm found under the hood of the Camry, but not at Doe's home; while others may have believed defendant possessed a firearm at Doe's home, but did not have dominion or control over the Camry. Without a unanimity instruction, the jury could have amalgamated these facts to come to the conclusion that defendant must have had possession of a firearm that night, but disagreed on which instance constituted the charged offense. This is exactly what a unanimity instruction is designed to prevent.

---

[9] The prosecutor failed to acknowledge in his closing argument that, during both direct examination and cross-examination, Doe conceded that she did not actually see a gun that night, but rather, she saw only something "shiny" in defendant's hands, and admitted "[i]t was hard to see" and that she could "just see, like, shiny parts" from her vantage point.

16

Because the evidence presented a risk that the jury may divide as to which act constituted the charged conduct, a unanimity instruction was required. Accordingly, the trial court should have, sua sponte, instructed the jury that they must unanimously agree which instance of possession they were using to find defendant guilty of unlawful possession of a firearm and ammunition.

### 3. The Continuous Course of Conduct Exception is Inapplicable to These Facts

The Attorney General argues that the continuous course of conduct exception applies, alleviating the need for the instruction. The continuous course of conduct exception arises in two contexts. (*People v. Gunn* (1987) 197 Cal.App.3d 408, 412.) "'The first is when the acts are so closely connected that they form part of one and the same transaction, and thus one offense. [Citation.] The second is when . . . *the statute* contemplates a continuous course of conduct of a series of acts over a period of time.'"[10] (*Ibid.*) Only the first context is applicable here, as neither former section 12021, subdivision (c)(1) nor section 12316, subdivision (b)(1) contemplate a continuous course of conduct.

The first facet of the exception holds that a unanimity instruction is not "'required when the acts alleged are so closely connected as to form part of one continuing transaction or course of criminal conduct,'" or ""'when the defendant offers essentially

---

[10] Cases in which the second part of the exception has been applied include cases of child abuse (*People v. Ewing* (1977) 72 Cal.App.3d 714, 717), or animal abuse (*People v. Sanchez* (2001) 94 Cal.App.4th 622, 633), in which the offense itself contemplates a prolonged type of conduct.

17

the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them." [Citations.]' [Citation.]" (*People v. Percelle* (2005) 126 Cal.App.4th 164, 181-182 (*Percelle*); see also *People v. Stankewitz* (1990) 51 Cal.3d 72, 100.) The justification for the exception is that there is no need for an instruction when there is a single course of conduct because members of the jury cannot distinguish between the separate acts. Further, the instruction is unnecessary when the defendant proffers the same defense to multiple acts because a guilty verdict indicates that the jury rejected the defendant's defense in toto. (See *People v. Winkle* (1988) 206 Cal.App.3d 822, 826 [concluding that a unanimity instruction is unnecessary when the jury's verdict implies that it did not believe the *only* defense offered].)

Instances in which one continuous course of conduct have been found, thus alleviating the need for a unanimity instruction, include *People v. Flores* (2007) 157 Cal.App.4th 216 (*Flores*) and *Percelle, supra,* 126 Cal.App.4th 164. In *Flores,* the court determined that a unanimity instruction was not required in a prosecution for assault with a semiautomatic firearm. There, the defendant fired multiple rounds using the same firearm while standing in the same location. (*Flores, supra,* at p. 223.) The court reasoned that, because the shots were fired repeatedly, within *moments* of one another, there was no reasonable basis for the jury to distinguish between each gunshot. The rapid succession of the shots, fired while defendant stood in the same location, formed one continuous transaction. (*Ibid.*) Therefore, the gunshots collectively could be used to prove the assault charge, and a unanimity instruction was not required. (*Ibid.*)

18

In *Percelle*, the court held that a unanimity instruction was not required in a prosecution for use of fraudulent credit cards. There, the defendant tried to make two purchases with a fraudulent credit card within an hour of one another. (*Percelle, supra* 126 Cal.App.4th at p. 181.) During the first attempt, the defendant tried to purchase 60 cartons of cigarettes with a fraudulent Visa card. (*Id.* at p. 169.) The store clerk, who knew the defendant had used fraudulent credit cards at the store in the past, stalled to allow time for the police to arrive. The defendant got nervous and left. However, the defendant returned an hour later and again tried to purchase the *same* 60 cartons of cigarettes, with the *same* card. (*Ibid.*) The police arrived while the defendant was still in the store, and arrested him. At trial, the defendant offered the same defense to both acts, asserting that there was no evidence the card was counterfeit. (*Id.* at pp. 170, 182.)

On appeal, the defendant argued the trial court committed reversible error when it failed to administer a unanimity instruction. The court disagreed and held that a unanimity instruction was not required because the defendant's actions constituted one continuous course of conduct. (*Percelle, supra* 126 Cal.App.4th at p. 181.) The court reasoned that there was "no reasonable basis" for the jury to distinguish between the defendant's first visit to the store and his second visit an hour later. (*Id.* at p. 182.) Although the two instances were separated by time, the defendant attempted to make the *same* purchase using the *same* counterfeit card. And because the defendant offered the same defense to both acts, the guilty verdict signified that the jury rejected his defense in

19

toto. (*Ibid.*) Accordingly, the exception to the unanimity instruction requirement was applicable, and the defendant's conviction was affirmed.

*Flores* and *Percelle* demonstrate that a continuous course of conduct exists when the same actor performs the same type of conduct at the same place within a short period of time, such that a jury cannot reasonably distinguish different instances of conduct. *Percelle* further demonstrates that the exception is applicable when a defendant proffers the same defense to multiple acts because the return of a guilty verdict indicates that the jury rejected the defendant's defense in toto.

The Attorney General argues that the facts here are indistinguishable from cases like *Flores* and *Percelle*, contending that there was but one possession of the gun. The Attorney General contends that defendant possessed the gun during the shooting at Doe's house and then presumably hid the gun, which was found approximately one to two hours later under the hood of the Camry. Because the conduct was close in time and space, the argument goes, there was but one transaction or continuous course of conduct. This theory is supported by Doe's testimony on direct examination that defendant had a gun with him when he showed up at her home and that the gun was the same gun found under the hood of the Camry. However, on cross-examination, when asked whether defendant had a gun in his hand, Doe stated only that he had "something shiny" in his hands and that she never actually saw the gun. Because of her equivocation, jurors could reasonably doubt Doe's initial identification of the gun and, together with other conflicting evidence,

20

conclude that defendant did not have a gun at Doe's house or, if he did, it was not the same gun found in the Camry.

Thus, the record reveals the possibility of two distinct possessions separated by time and space. More importantly, the record also reveals that defendant tendered a different defense to each alleged possession. Defendant's defense to the alleged possession at Doe's house was that he did not have a gun. In support of this theory, he presented evidence that Officer Hill conducted a thorough search of his person, Miller's person, and the Oldsmobile immediately prior to the shooting at Doe's house. Further, defendant presented the testimony of Perez, who testified that defendant did not have a gun that night, but that Doe and Fuentes did.

With regard to the possession of the gun hidden under the hood of the Camry, defendant did not deny the existence of the gun. Rather, defendant argued that the prosecutor had failed to establish that defendant had "dominion and control" over the gun, as is required to constitute the offense. The prosecutor did not put forth any evidence that defendant owned the car, but established only that defendant had used the car on a handful of occasions. He further argued that Miller's testimony that defendant did not possess a gun that night also supported his position. It is also of some significance that the gun recovered from the Camry was fully loaded, indicating that the gun had not been recently fired.

While much of the testimony in this case was inconsistent, there was evidence from which some jurors could have found defendant guilty of the charged offenses based

21

upon the incident at Doe's home, but conclude that the evidence was insufficient to establish defendant's dominion and control over the weapon recovered from the Camry, while other jurors could have harbored reasonable doubt as to whether defendant possessed a gun at Doe's residence, but were persuaded that he possessed the gun inside the Camry. Thus, there was clearly a risk that the jury divided on which instance of possession constituted the charged offenses.

Further, these separate instances of possession, separated by time and space, are similar to cases in which courts found the continuous conduct exception inapplicable and held the failure to give a unanimity instruction was error. In *People v. Crawford* (1982) 131 Cal.App.3d 591 [Fourth Dist., Div. Two] (*Crawford*), for example, officers executing a search warrant found the defendant and his girlfriend in the defendant's bedroom. They also found a .357 Magnum in a holster at the foot of the bed and a .22 Luger in the bedroom closet. Both the defendant and his girlfriend denied ever seeing the gun in the holster. The girlfriend testified that the gun in the closet belonged to her. In rebuttal, the prosecution introduced evidence that two more firearms, a .38 Derringer and another .357 Magnum, had been found in an upstairs bedroom in which a third person was sleeping. (*Id.* at pp. 594-595.) The defendant was convicted of possession of a firearm following a felony conviction. (*Id.* at p. 593.)

This court held that the trial court erred by failing to give a unanimity instruction sua sponte: "[C]ertain jurors might have been convinced [the] defendant possessed one weapon, while others were convinced he possessed another weapon without all jurors at a

22

minimum believing he possessed any one weapon. It is this unacceptable possibility which taints the verdict in this case." (*Crawford, supra,* 131 Cal.App.3d at p. 596.) We further concluded that although the defendant's possession was not fragmented as to time, "the possession was fragmented as to space," as "[g]uns were in different parts of the house [and] the evidence showed unique facts surrounding the possessory aspect of each weapon." (*Id*. at p. 599.) Thus, "[c]ertain jurors might quite easily have been persuaded beyond a reasonable doubt that [the defendant] possessed one gun, but not another." (*Id.* at p. 598.)

In *Wolfe, supra,* 114 Cal.App.4th 177, the defendant was charged with one count of unlawful possession of a firearm after an officer observed and recovered numerous guns from the defendant's home. (*Id.* at p. 181.) The guns were hidden in a variety of places throughout the home: some in a dishwasher, some in a shower, and others in a secret compartment in the kitchen ceiling. (*Id.* at pp. 181-182.) At trial, the prosecution presented evidence of six guns found in the defendant's home, any of which could have constituted the charged offense. (*Ibid.*) The defendant presented a unitary defense, arguing all of the guns belonged to his mother. (*Id.* at p. 182.) His mother testified on his behalf, conceding that all of the guns were hers. The prosecutor did not elect which firearms he was using to prove the offense and the trial court did not administer a unanimity instruction. The jury returned a guilty verdict on the charge of unlawful possession of a firearm.

On appeal, the defendant argued that the trial court's failure to give the unanimity instruction was error because some of the jurors could have convicted the defendant based on possession of different guns. (*Wolfe, supra,* 114 Cal.App.4th at pp. 183-184.) This court agreed, holding that "the trial court . . . erred by failing to give a unanimity instruction." (*Id*. at p. 185.) We likened the facts in *Wolfe* to those in *Crawford*, reasoning that "[a]s in *Crawford,* [the] defendant's possession of the various firearms was 'fragmented as to space.' . . . moreover, [the defendant's possession] was fragmented as to time. And, again as in *Crawford,* the circumstances surrounding the possession of the different firearms were significantly different." (*Wolfe, supra,* at p. 185.)

Like the facts in *Crawford* and *Wolfe*, the circumstances surrounding each instance of possession in the instant case were significantly different. They were separated in time and in space, and defendant tendered different defenses to each instance of possession. On these facts, jurors could be easily persuaded beyond a reasonable doubt that defendant possessed a gun at one time, but not another. Accordingly, we must conclude that the continuous conduct exception is inapplicable to these facts. Therefore, the trial court was required to administer a unanimity instruction to the jury.

B. *The Trial Court's Failure to Give a Unanimity Instruction Sua Sponte Was Not Harmless Error*

The Attorney General argues that even if a unanimity instruction was required, the trial court's failure to give the instruction was harmless error. Defendant contends the

24

error was not harmless because of the risk his conviction was based on a nonunanimous verdict.

There is a split of opinion in the appellate courts as to whether the *Chapman* standard or *Watson* standard for harmless error applies in a unanimity instruction case. (See, e.g., *People v. Matute* (2002) 103 Cal.App.4th 1437, 1448 [noting conflicting authorities].) The majority of the courts that have addressed the issue have applied *Chapman*. (See, e.g., *Wolfe, supra,* 114 Cal.App.4th at pp. 186-188; *People v. Smith* (2005) 132 Cal.App.4th 1537, 1545; *People v. Deletto* (1983) 147 Cal.App.3d 458, 472; but see *People v. Vargas* (2001) 91 Cal.App.4th 506, 562 [*Watson* standard applies].)

In *Wolfe*, this court explained that federal due process requires that the prosecution convince a jury of the defendant's guilt of the crime beyond a reasonable doubt. (*Wolfe, supra,* 114 Cal.App.4th at pp. 186-188.) "When the trial court erroneously fails to give a unanimity instruction, it allows a conviction even if all 12 jurors (as required by state law) are not convinced that the defendant is guilty of any one criminal event (as defined by state law). This lowers the prosecution's burden of proof and therefore violates *federal constitutional law*." (*Id.* at pp. 187-188, italics added.) Because the error violates federal constitutional rights, the *Chapman* standard applies. (*Wolfe, supra,* at p. 188.)

Under *Chapman,* the failure to give a unanimity instruction is harmless "[w]here the record provides no rational basis, by way of argument or evidence, for the jury to distinguish between the various acts, and the jury must have believed beyond a reasonable doubt that [the] defendant committed all acts if he committed any, the failure

to give a unanimity instruction is harmless." (*People v. Thompson* (1995) 36 Cal.App.4th 843, 853 (*Thompson*).) For example, where the defendant offered the same defense to all criminal acts, and "the jury's verdict implies that it did not believe the only defense offered," failure to give a unanimity instruction is harmless error. (*People v. Diedrich* (1982) 31 Cal.3d 263, 283.) But if the defendant offered separate defenses to each criminal act, reversal is required. (*People v. Castaneda* (1997) 55 Cal.App.4th 1067, 1071; *Thompson, supra,* at p. 853.) The error is also harmless "[w]here the record indicates the jury resolved the basic credibility dispute against the defendant and therefore would have convicted him of any of the various offenses shown by the evidence . . . ." (*Thompson, supra,* at p. 853.)

In *Wolfe,* we determined that the failure to give a unanimity instruction was harmless error because the defendant presented a unitary defense to all instances of possession (arguing that all six guns belonged to the defendant's mother). We reasoned that the jury's return of a guilty verdict meant that the jury rejected the defendant's defense in toto, resolving the credibility dispute in the prosecution's favor.[11] (*Wolfe, supra*, 114 Cal.App.4th at p. 188.) Thus, although the instruction was warranted, the trial

---

[11] Here, the jury found defendant not guilty on count 4, and was unable to reach a verdict on count 2. The fact that the jury acquitted defendant on count 4, and was unable to unanimously agree on count 2, indicates the jury *did* find the defense's evidence credible in *some* regard. We realize that the evidence presented on counts 2 and 4 may not have been related to the defenses asserted as to counts 5 and 6; however, the jury's findings on counts 1 and 4 imply that the jury found defendant credible to some extent, and did not reject all of defendant's evidence as incredible. Thus, unlike the facts in *Wolfe*, we cannot conclude that the jury rejected defendant's two asserted defenses "in toto."

court's failure to give the instruction was not prejudicial. (*Ibid.*) This logic is inapplicable to the facts in the instant case, as defendant here did not present a unitary defense to both instances of possession.

In *Thompson*, the court held that the failure to give a unanimity instruction was not harmless because "different defenses gave the jury a rational basis to distinguish between the various acts." (*Thompson, supra,* 36 Cal.App.4th at p. 853.) There, the defendant was convicted of diverting construction funds over a period of months in violation of section 484, subdivision (b). At trial, the defendant offered different defenses to two specific instances of conduct, either of which could have constituted the charged offense. The prosecutor did not elect a specific act to prove the diversion of funds. (*Id.* at p. 851.) The trial court denied the defense's request for a unanimity instruction. (*Id.* at p. 849.)

On appeal, the *Thompson* court agreed with defendant that a unanimity instruction was warranted. The court further determined that failure to give a unanimity instruction could not be harmless error when the defendant raised separate defenses to the various acts of conduct. The court stated that "[t]he different defenses gave the jury a rational basis to distinguish between the various acts" and, therefore, it was "'not a case where the jury's verdict implies that it did not believe the only defense offered.'" (*Thompson, supra,* 36 Cal.App.4th at p. 853.)

The same problem is present here. As we have already explained, defendant proffered a different defense to each instance of conduct, which "raise[s] the problem the unanimity instruction was designed to prevent." (*Thompson, supra,* 36 Cal.App.4th at p.

27

852.) The fact that defendant tendered two different defenses means that some jurors could have believed defendant was in possession of a firearm outside of Doe's house and convicted him based on that instance of possession. Others could have believed defendant possessed the same gun at both locations. Still other jurors could have believed that the fully loaded revolver found in the Camry was not shot that night, chose to believe Perez's testimony that Fuentes was the shooter that night, and convicted defendant solely upon the fact that a gun was found under the hood of the Camry.

Applying the *Chapman* standard to these facts, we cannot say that the jury unanimously rested its verdict on the same instance of possession to convict defendant of unlawful possession of a firearm and ammunition. Because we cannot conclude beyond a reasonable doubt that each juror agreed on the particular criminal act that formed the basis of the verdict, the error was not harmless. For that reason, we must reverse.[12] Because we reverse due to this instructional error, we need not reach defendant's other contentions on appeal.

---

[12] Even if the *Watson* standard applies, the error is not harmless. Under *Watson*, a "'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson, supra,* 46 Cal.2d at p. 836.) A """"probability" in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*.' [Citation.]"' [Citation.]" (*People v. Wilkins* (2013) 56 Cal.4th 333, 351.) Viewing the record in its entirety, we believe there is a reasonable chance and more than an abstract possibility that a result more favorable to defendant would have been reached had a unanimity instruction been properly given. As such, the error is not harmless under *Watson*.

## IV.  DISPOSITION

Defendant's convictions on counts 5 and 6 for unlawful possession of a firearm and ammunition are reversed.  In all other respects, the judgment is affirmed.

CERTIFIED FOR PUBLICATION


KING
Acting P. J.


We concur:

MILLER
J.

CODRINGTON
J.


29