Filed 6/8/16  P. v. Seals CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B260985 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA099168) |
| v. | |
| TOI SEALS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark C. Kim, Judge.  Reversed.

Christian C. Buckley, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Michael R. Johnsen and Wyatt E. Bloomfield, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## INTRODUCTION

Defendant Toi Seals appeals from a judgment of conviction entered after a jury found him guilty of assault by means likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4)). The trial court found true the allegations that defendant suffered a prior conviction of a serious or violent felony (*id*., §§ 667, subds. (b)-(i), 1170.12) and served a prior prison term (*id*., § 667.5, subd. (b)). The court sentenced defendant to the upper term of four years, doubled as a second strike, plus one year for the prior prison term, for a total sentence of nine years in state prison. On appeal, defendant contends the trial court erred in failing to give a unanimity instruction. Because we agree, we reverse the conviction without ruling on the remaining claims about the trial court's denial of a new trial and calculation of custody credits.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. THE EYEWITNESS ACCOUNT OF THE CHOKING

Shortly after midnight on May 17, 2014, defendant and Monique Peterson, his girlfriend on and off for nine years, were in his car in a liquor store parking lot in Long Beach, California. Kenneth Irvins was walking by and heard someone gasping for air and heard a woman "yelling, screaming, something about a baby." He looked inside the car and saw defendant and Peterson sitting in the front. Defendant was behind Peterson, with her back facing his front and her feet hanging out the door. Defendant had his forearm around Peterson's neck in a chokehold, "choking her out." While Irvins saw defendant choke Peterson, he did not see defendant hit her. Irvins went to a pay phone across the street and called 911.

Long Beach Police Officer Bryant Yuriar and his partner arrived at the scene while Irvins was still on the phone, and he pointed out defendant's car in the parking lot. The officers went over to the parking lot. Peterson was standing outside the car, and defendant was in the driver's seat. Peterson had several seemingly "fresh" injuries, including cuts, bruising, and swelling on her face. One of her eyes was swollen shut. When the officers approached her, she said "nothing happened."

2

Officer Yuriar looked in the car and saw fresh blood spatter, a piece of Peterson's hair weave on the floor, and a crack in the front windshield. The officers detained defendant, who had fresh blood on his face and shirt and fresh blood and cuts on his knuckles. He told the officers, "I didn't hit her, I got in a fight with some Crips."

**B.     THE ARREST AND THE JAIL CALLS**

The officers arrested defendant and placed him in the patrol car. Once in the car, defendant began kicking the back window. The officers had to tie his legs to the floor of the car to restrain him. On the way to the police station, he threatened to assault the officers. During booking, he demanded to know what Peterson had told them.

After he was jailed on May 17, defendant called Peterson. They talked about her coming to the jail, and the following conversation took place:

> "[Peterson]:  I can't go outside Toi, . . . my eyes [are] purple and red
> inside, I can't see out of neither of them[.]
> "[Defendant]:  You love me?
> "[Peterson]:  Yeah.
> "[Defendant]:  I love you too . . . .
> "[Peterson]:  Well . . . I don't think people that love people do this to
> them.
> "[Defendant]:  Yeah, I love you though, man.  Shut up you talking
> too much."

Two days later, on May 19, defendant and Peterson discussed what she was going to tell the police. They agreed to tell the police that Peterson was injured on May 9, when she was beaten up, because she had hospital paperwork that would support that story. A few hours after that conversation, Peterson called Long Beach Police Detective Jeff Conrad and told him that two women had beaten her up prior to defendant's arrest. Detective Conrad told her that he had listened to defendant's jail calls with her, and that he had an independent witness (i.e., Irvins). Peterson said nothing else and hung up the phone. Detective Conrad did not investigate Peterson's claim of a prior assault because he believed it was fabricated based on the jail calls.

3

## C.    PETERSON'S ACCOUNT OF HER INJURIES AT TRIAL

At trial, Peterson denied that defendant had injured her.  She testified that she received her injuries about an hour earlier in a separate incident at a separate location involving two women who assaulted her.

According to Peterson, shortly before meeting defendant in Long Beach, she was attacked in Compton by two women named "Lavette" and Kanita Burns, one of whom was the mother of defendant's child.  The three women were intoxicated and got into an argument.  Lavette and Burns started punching and kicking Peterson, who was repeatedly punched in the face until the fight was broken up by people in the area.  Peterson testified that she received all the injuries to her face (i.e., the cuts, bruising, and swelling) during that fight, and that those injuries were still "fresh" when the police saw her and defendant in Long Beach an hour later.  After the fight, Peterson did not call the police and instead drove to a nearby friend's house and continued to drink alcohol.  From there, she called defendant and asked him to meet her at the liquor store.  When he met her there, she was furious and began "cussing him out" for cheating on her.  He denied sleeping with Lavette and Burns and told her to go home.

Peterson testified that defendant did not strike or choke her.  She explained that the blood and hair in defendant's car were from the fight with Lavette and Burns: she was still bleeding while in the car; and she removed from her face portions of her hair weave that had become detached during the previous incident.  When the police officers arrived at the liquor store parking lot, she told them that defendant did not assault her.  She also told them about the previous assault and gave them the names of the two women who had caused her injuries.  The officers, however, insisted that defendant had assaulted her and threatened to take her children away if she did not admit it.  Peterson also testified that she later obtained restraining orders against Lavette and Burns and pursued criminal charges against them.

Peterson further explained that the prosecution misinterpreted the two telephone conversations she had with defendant while he was in jail.  During the first call, on the day of defendant's arrest, she did not suggest that he had beaten her when she said:  "I

4

don't think people that love people do this to them." Instead, she meant only to say that people who love each other don't "sleep with other people." During the second call, on May 19, she did not suggest that she would lie for defendant when she said: "I think I should tell them that I got beat up on the 9th." Instead, she meant only to say that she would tell the truth to the police that she was assaulted by Lavette and Burns on both May 9th and May 16th.

## D. CLOSING ARGUMENTS AND THE JURY QUESTION

### 1. *The First Round of Closing Arguments*

In closing argument, the prosecutor asserted that defendant was guilty of aggravated assault based on the fact that he (1) choked Peterson (the choking) and (2) assaulted her in a manner that caused her to bleed, bruise, swell, and lose hair (the beating). He argued that the act of choking constituted force likely to produce great bodily injury, as shown by the evidence that Peterson was gasping for air. He next argued that the injuries to her face and head—the swelling, bleeding, bruising, and loss of hair—had to be delivered with an amount of force that "could have caused broken bones, concussions, torn muscles, cuts which require stitches, any of which are significant or substantial injuries."

Defense counsel responded that Peterson sustained her injuries before meeting defendant in Long Beach, as she repeatedly told the police. He also challenged the prosecution's claim that defendant had choked Peterson, pointing out that she had no injuries to her neck, which would be expected if defendant had choked Peterson so hard that she was gasping for air. "At most, [defendant is] guilty of simple assault for presumably trying to hold her as a result of their arguing."

### 2. *The Jury Questions*

During deliberations, the jury sent two questions to the court that focused on the evidence of choking. They first asked: "What category does choking fall under"? The court responded by referring them to the applicable instructions. The jury then notified the court that it could not reach a decision based on the instructions and asked: "Is choking simple assault, or is it great[] bodily injury"?

5

The court advised the parties that it could not provide any further legal guidance to the jury because they were raising a "factual" question. The court then allowed another round of closing arguments, limited to 10 minutes for each party to address the question asked by the jury. (See *People v. Young* (2007) 156 Cal.App.4th 1165, 1172 [approving procedure to reopen closing argument to assist in overcoming a deadlock].) Each party agreed to this procedure and presented another argument.

3.     *The Second Round of Closing Arguments*

The prosecutor did not limit his argument to the specific question posed by the jury. He first argued that the "act [of choking] by itself . . . is sufficient enough[ to] cause great bodily injury" because it could result in serious throat and esophagus problems and it could even lead to death. The prosecutor went on to argue, however, that defendant also committed another act of aggravated assault: "[Y]ou also have him hitting her with his hands, punching her in the face causing the swelling to her eyes, causing the busted lip, causing the wet blood on his hands and his knuckles to have blood on them." The prosecutor explained: "So this isn't simply just a strangulation or choking case; we would argue to you that strangulation by itself was sufficient. But not only do you have strangulation, but you have him assaulting her in other manners in that car by punching her in the face and by pulling out her hair."

Defense counsel then argued that the choking was not likely to lead to great bodily injury. He noted that Irvins was able to hear Peterson speak during the incident and that Peterson had no marks on her neck, both of which suggested that this was not "a dangerous choking situation." Defense counsel also argued that the type of choking described by Irvins was "consistent with [his] client acting in a defensive way, not consistent with someone who was inflicting great bodily injury."

After the second round of arguments, the jury resumed deliberations and shortly thereafter rendered a guilty verdict, convicting defendant on the aggravated assault charge in the information.

6

## DISCUSSION

**A.    THE LAW ON UNANIMITY**

In a criminal case, the jury verdict must be unanimous.  (Cal. Const., art. 1, § 16; *People v. Russo* (2001) 25 Cal.4th 1124, 1132; *People v. Hernandez* (2013) 217 Cal.App.4th 559, 569.)  An issue of unanimity arises when "the evidence [at trial] establishes several acts, any one of which could constitute the crime charged."  (*People v. Jennings* (2010) 50 Cal.4th 616, 679.)  In such a case, unless the prosecution "select[s] the particular act upon which it relied for the allegation of the information," the court is required to instruct the jury "that it must agree unanimously upon which act to base a verdict of guilty."  (*Ibid*; accord, *Russo*, *supra*, at p. 1132.)  The instruction must be given, when required, even in the absence of a request.  (*People v. Riel* (2000) 22 Cal.4th 1153, 1199 [court has sua sponte obligation].)  "[A] failure to give the instruction when it is warranted abridges the defendant's right to due process, as it runs the risk of a conviction when there is not proof beyond a reasonable doubt."  (*Hernandez*, *supra*, at p. 570; accord, *People v. Arevalo-Iraheta* (2011) 193 Cal.App.4th 1574, 1588 ["A criminal defendant is entitled to a verdict in which all 12 jurors concur as a matter of due process under the state and federal Constitutions"].)

In deciding whether the unanimity instruction is required, "the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime.  In the first situation, but not the second, it should give the unanimity instruction."  (*People v. Russo*, *supra*, 25 Cal.4th at p. 1135.)  In addition, a unanimity instruction need not be given "'when the acts alleged are so closely connected as to form part of one transaction' and 'the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them.'  [Citation.]"  (*People v. Ervine* (2009) 47 Cal.4th 745, 788, quoting *People v. Stankewitz* (1990) 51 Cal.3d 72, 100.)

7

**B.      A UNANIMITY INSTRUCTION WAS REQUIRED**

Defendant argues that a unanimity instruction, though not given, was required here because "[t]wo independent acts potentially supported the charged assault"—the choking and the beating.  He claims that there was a risk that some jurors may have convicted him based solely on the choking while other jurors may have convicted him based solely on the beating.  In view of the conflicting evidence, the arguments, and the jury questions, we agree.

The parties presented conflicting evidence of the cause of Peterson's injuries.  The prosecution claimed that all her injuries resulted from one continuous act: a beating that included choking.  In support, the prosecution submitted direct evidence of the choking (i.e., an eyewitness), circumstantial evidence of the beating (i.e., the fresh injuries), and other evidence suggesting Peterson lied about what happened (i.e., the jail calls).  The defense, on the other hand, claimed that the injuries were inflicted by two women in a fight an hour earlier—explaining the fresh injuries—and provided a nonincriminating explanation for the jail calls.  The jury was thus confronted with a credibility determination, largely in the form of evaluating Peterson's testimony.  In making this evaluation, the jury was free to accept or reject her testimony in whole or in part: the jurors could have believed that Peterson contrived the entire story, that she lied only about not being choked, or that she was telling the entire truth.  While the jury clearly concluded that Peterson was not completely truthful, the record does not permit us to draw any further conclusions about the jury's deliberations.

Like the conflicting evidence, the parties' closing arguments offered the jury a path to a conviction that would not necessarily be unanimous.  During the first round of closing arguments, the prosecutor stated that there were two separate mechanisms of injury, the choking and the beating, which occurred at the hands of defendant while he and Peterson were in the car.  In responding to the jury's question in the second round of closing arguments, the prosecutor did not focus on the act of choking, as had been asked, but rather emphasized that the beating also would qualify as an aggravated assault.  For his part, defense counsel emphasized Peterson's testimony that defendant did not cause

8

her injuries, but he also had argued in the alternative that the jury could conclude that his client committed "simple assault" as a result of the evidence of choking.

The jury's questions indicate that the jurors were focusing on the choking—which was witnessed by a neutral third party but left no marks—and were struggling to determine whether that act constituted simple or aggravated assault. In its second question, the jury disclosed that it was at an impasse, suggesting a split of opinion on this issue. Although the trial court properly limited the arguments to the question asked by the jury, the prosecutor exceeded those limits by discussing the beating and the choking. The effect of the prosecutor's argument was to allow for a verdict without unanimity: some jurors could have found defendant guilty of aggravated assault based on the beating but not the choking; other jurors could have found defendant guilty of aggravated assault based on the choking but not the beating.

Because the evidence showed two different acts that could have constituted the charged offense—one of which arguably was not committed by defendant (the beating) and one of which arguably did not rise to the level of the charged offense (the choking)—a unanimity instruction was required. "Without a unanimity instruction, the jury could have amalgamated these facts to come to the conclusion that defendant must have [committed the crime], but disagreed on which instance constituted the charged offense. This is exactly what a unanimity instruction is designed to prevent." (*People v. Hernandez*, *supra*, 217 Cal.App.4th at p. 571.)[1]

---

[1]     In *Hernandez*, the defendant was convicted of illegal possession of a firearm, among other charges. At trial, there was conflicting testimony about whether he had a gun when he went to his girlfriend's house after a violent encounter with her earlier that day. After leaving her house, the police stopped the defendant in the car he normally drove (a Camry) and found a loaded gun in the engine compartment. In holding that the trial court committed reversible error in not giving a unanimity instruction sua sponte, the court reasoned: "[T]here was evidence from which some jurors could have found [the] defendant guilty of the charged offenses based upon the incident at [his girlfriend's] home, but conclude that the evidence was insufficient to establish [the] defendant's dominion and control over the weapon recovered from the Camry, while other jurors could have harbored reasonable doubt as to whether [the] defendant possessed a gun at

In these circumstances, the People's reliance on the continuous crime exception is misplaced. Under this exception, a unanimity instruction need not be given when the acts were part of a single course of action. This is based on the assumption that if a jury believes the defendant committed one of the acts, it must also reasonably conclude the defendant committed the other acts in light of their close connection. (*People v. Lueth* (2012) 206 Cal.App.4th 189, 196.) No such assumption can be made in this case: we cannot assume all 12 jurors agreed that the choking and beating occurred as part of a continuous course of conduct when the jury focused exclusively on the choking prior to the second round of closing arguments. This singular focus suggests that at least some jurors were not persuaded that defendant had beaten Peterson as well. This critical fact distinguishes the cases upon which the People rely. (See, e.g., *People v. Robbins* (1989) 209 Cal.App.3d 261, 265-266 [no unanimity instruction required when "there is no danger the jury will convict a defendant of a crime based on two different factual scenarios, neither of which is believed by all [12] jurors," because the attack on the victim was "one prolonged assault"].)[2]

## C.    THE FAILURE TO INSTRUCT WAS NOT HARMLESS

There is a split in authority on the applicable harmless error standard when reviewing the failure to give a unanimity instruction. (*People v. Hernandez*, *supra*, 217 Cal.App.4th at p. 576 [discussing the split].) Under the *Watson* standard, the test is

---

[the girlfriend's] residence, but were persuaded that he possessed the gun inside the Camry." (*People v. Hernandez*, *supra*, 217 Cal.App.4th at p. 574.)

[2]    The need for a unanimity instruction in this case arose out of a unique set of facts. The issue of unanimity would not have been apparent at the outset because the prosecution claimed that the beating and choking occurred as one discrete criminal event, while the defense argued that defendant neither beat nor choked Peterson. The case thus seemed to fall within the continuous crime exception when the trial started. The jury's questions, however, raised the specter of two discrete criminal acts, only one of which was committed by defendant. The prosecutor's argument in response to those questions opened the door to a nonunanimous verdict on the charged crime of aggravated assault. We do not suggest that the prosecutor did so intentionally, nor do we fault the trial court for failing to anticipate this unusual turn of events.

whether "a result more favorable to [the] defendant would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 837.) Under the *Chapman* standard, the test is whether the beneficiary of the error can "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 17 L.Ed.2d 705].)

We need not decide whether to apply the *Watson* or *Chapman* standard here because we are unable to find the error harmless under either standard. The jury signaled that it could not reach unanimity on the question whether the choking of Peterson was a simple or aggravated assault. In attempting to break that deadlock, the prosecutor's argument reintroduced the beating of Peterson—which was a separate act, according to the defense evidence. In light of the prosecution's argument, we cannot say with the requisite degree of confidence that all 12 jurors convicted defendant of aggravated assault based on the choking. Indeed, the prosecution's evidence that defendant beat and choked Peterson was strong, yet the jury focused on the choking and almost deadlocked on whether that act constituted simple or aggravated assault. On these facts, we are unable to conclude that no juror voted to convict defendant of aggravated assault based on the injuries caused by the beating rather than the choking. Consequently, we cannot find the error here to be harmless.[3]

---

[3] In light of this conclusion, we need not reach defendant's additional contentions regarding his new trial motion and his presentence custody credits.

## **DISPOSITION**

The judgment is reversed, and the case is remanded for a new trial.


BLUMENFELD, J.[*]


We concur:


ZELON, Acting P. J.


SEGAL, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.