Filed 7/24/15  P. v. George CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H040665 |
| Plaintiff and Respondent, | (San Benito County Super. Ct. No. CR1000848) |
| v. | |
| FREDERICK LOUIS GEORGE, | |
| Defendant and Appellant. | |

Defendant Frederick Louis George appeals from a judgment of conviction entered after a jury found him guilty of two counts of lewd acts upon a child under the age of 14 (Pen. Code, § 288, subd. (a)).[1]  The trial court sentenced defendant to 10 years in state prison.  We conclude that the judgment must be reversed, because the trial court erred when it failed to give a unanimity instruction.

## I.  Statement of the Case

An amended criminal complaint charged defendant with four counts of lewd acts upon a child under the age of 14 (§ 288, subd. (a) – counts 1 through 4).  It was alleged that defendant engaged in substantial sexual conduct with the victim in connection with

---

[1]     All further statutory references are to the Penal Code.

count 4.  The complaint also charged defendant with:  one count of forcible rape (§ 261, subd. (a)(2) – count 5), one count of sexual penetration by foreign object (§ 289, subd. (a)(1) – count 6), and two counts of aggravated sexual assault of a child based on the rape and the sexual penetration (§ 269 – counts 7 and 8).

Following trial, the jury found defendant guilty of counts 1 and 4, acquitted him of counts 2, 3, 5, and 7, and was unable to reach a verdict on counts 6 and 8.  It found the special allegation for count 4 to be true.  The trial court granted the prosecution's motion to dismiss counts 6 and 8.

Defendant brought a motion for a new trial and argued, among other things, that the trial court erred when it failed to instruct the jurors on unanimity.  The trial court denied the motion except as to the substantial sexual conduct finding for count 4.

At sentencing, the trial court imposed the upper term of eight years for count 1 and one-third the middle term of two years for count 4.  It awarded 363 days of presentence credit.  Defendant has filed a timely appeal.

## II. Statement of Facts
### A. Prosecution Case
### 1. Background

Defendant and his wife Renee George adopted six children:  Keith, A., Madison, Ben, Kailey, and Leah.  A. was born in April 1997.  Keith was about four months older than A.  Madison was about a year younger than A.  A.'s biological father was schizophrenic and her biological mother had bipolar disorder.  A. was adopted when she was four years old.  According to Ms. George, A. was confused, angry, and very difficult to raise at that time.  It required more effort by Ms. George to create a bond with A. than with the other children.  When A. was nine years old, she began therapy for detachment

2

disorder.  About a year later, she began therapy with Marina Boliaris, who diagnosed her with mood disorder.

## 2.  A.'s Testimony

A. was 15 years old at the time of trial.  She was closer to defendant than to her mother, because her mother would punish her "for unreasonable things."  Her mother yelled at her and put her in her room, because she had not done the dishes.  On another occasion, A. lied to her mother and her mother did not speak to her for two weeks.  Her mother also emptied out A.'s closet, put a mattress and blanket in the closet, and A. lived in the closet for a month or two.[2]  According to A., her mother antagonized her until she would "flip out."

A. testified that "the first time [defendant] inappropriately touched" her occurred on February 14, 2010, and later testified it was sometime after that date.  Defendant woke A. up, told her that she had been tossing and turning, and asked her to go downstairs.  It was approximately 5:30 a.m.  While they were on the couch, they began watching television and exchanged open-mouth kisses during the commercials.  Defendant asked A. if he could touch her breast.  She said yes because he was her father and she "couldn't say no."  Defendant put his hand under her T-shirt, unhooked her bra, and touched her breasts.  When defendant left for work, A. went back to bed.

However, A. also testified that defendant molested her on February 14, 2010, when her mother went to Gilroy to visit A.'s grandmother.[3]  The other children were watching television in the living room.  Defendant had a headache.  A. was lying on defendant's bed with him when they started kissing, "like how a girlfriend would kiss a boyfriend."  Defendant told her not to tell anyone.

---

[2]     Ms. George testified that it was Boliaris's idea to use the closet as a place for A. to calm herself.  Boliaris disputed Ms. George's testimony.

[3]     A. also testified that this incident occurred after February 14, 2010.

On cross-examination, A. testified that a "second" incident occurred sometime after February 14 after the inappropriate conduct on the couch. While they were in the garage, defendant fondled her breasts over her clothing and kissed her. Her brothers and sisters were also home at this time.

However, on direct examination, A. did not testify to the incident in the garage. She testified that after the incident on the couch, her mother took the children to see a Percy Jackson movie at the end of February or beginning of March. A. was not allowed to join them, because she had misbehaved. After taking a shower, A. began walking downstairs. Defendant was walking upstairs to go to A.'s room. Defendant told her that they needed to talk, took her back to her room, and told her that they had to "slow down." A. said okay. However, they started kissing. Defendant eventually removed her shirt, shut the window blinds, and touched her breasts. Defendant also pulled down her pants, put his finger in her vagina, and sucked her breasts. He tried to put two fingers in her vagina, but she told him that it hurt. After A. told him that they should stop, defendant asked if she "wanted to see him jerk off into the sink, and he asked if [she] wanted to help." He put her hands on his penis. Defendant told her that he could stop any time that she wanted him to, but she did not want to make him angry or disappointed in her.

A. testified on cross-examination that "there were little moments" between A. and defendant, including one day when defendant took her to her bedroom, digitally penetrated her, and told her "not to make a sound," because the other children were playing in the room across from her room. Defendant asked A. if she was going "to have an orgasm, and [she] didn't know what that meant."

A. testified on both direct and cross-examination that there was a final incident on February 20, 2010, when her mother went on an overnight trip to Capitola. Defendant told her that they would have "a whole night together." Since Keith was still on the computer, she pretended to fall asleep on the couch and then went into defendant's

4

bedroom. After A. undressed herself, she and defendant kissed. Defendant also sucked and touched her breasts, licked her vagina, and inserted his fingers inside.[4] This lasted "a couple of hours." When A. started to fall asleep, they took a shower together. While they were in the shower, he asked her to suck his penis, which she did. After A. became dizzy, they returned to the bed. Defendant tried to put his penis in her vagina, but it hurt her. She told him to stop and he did. Defendant digitally penetrated her until she told him to stop because she was tired. A. fell asleep. At around 4:30 a.m., defendant told her to return to her room, which she did. When she woke up the next morning, she was in a lot of pain and felt like she needed to urinate every five minutes.[5]

A. and defendant made a "pinkie swear" that they would not tell anyone about the incidents. Defendant told her that if she told anyone, he would probably go to jail and since he did not want to go to jail, he would probably kill himself. A. did not tell her mother because she believed that her mother would hate her.

### 3. Post-February 2010 Events

According to A., her mother became increasingly suspicious of defendant and A. Her mother threatened defendant when he took A.'s side. She also became angry with A. during arguments and A. would not know what she had done.

After the final molestation incident, A.'s parents began having "date nights" with their neighbors, Michelle and Bill Clawson. According to A., her mother dressed "really sketchy" on those nights, that is, she wore tall heels, short skirts, and tank tops that showed too much cleavage.[6] Seeing her mother dressed this way upset A., because she

---

[4]    While defendant was performing oral sex on her, Keith entered the bedroom. After that, defendant locked the door.

[5]    According to Ms. George, when she returned from her trip, A. and defendant were skateboarding while Madison was watching the other children. Both defendant and A. "seemed shocked like they were in trouble."

[6]    Ms. Clawson disagreed with A.'s description of her mother's dress.

was jealous. A. also hid in her room, because her mother "was always looking at [her] like it was a victory" and "she would just mak[e] it clear that he was hers." At that time, A. loved defendant like a boyfriend.

Sometime in the spring of 2010, Boliaris received telephone calls from Ms. George and defendant describing inappropriate behavior by defendant. After A. confirmed the behavior, which involved three long kisses, Boliaris made a suspected child abuse report to Child Protective Services (CPS). The Department of Children and Family Services received the suspected child abuse report on March 10, 2010. During the investigation by social worker Joshua Mercier, Ms. George stated her concerns: defendant focused more on A. than the other children and had difficulty concentrating when he was around A.; A. showed more affection towards defendant and less towards her; defendant had told her A. had initiated a kiss on the lips that made him feel uncomfortable and awkward, but Ms. George later discovered that this had happened on more than one occasion; and defendant gave A. responsibility for supervising the other children. Since A. did not disclose any abuse, Mercier concluded that the allegations were unfounded, instituted a safety plan with the family, and the case was closed on April 19, 2010.

According to Boliaris, A.'s "extreme behavior" after this disclosure "did not match" having received three long kisses from her father. "[I]t was like watching a girl break up with her boyfriend."

Sometime in mid-April 2010, defendant moved out of the family home for a couple of weeks and moved in with the Clawsons based on the recommendation of CPS. According to Ms. George, A. "was out of control, throwing stuff, slamming doors, swearing" during this period. A. also tried to stab herself with a knife, jump out of the car while Ms. George was driving, and hang herself with a scarf in the closet. One night Ms. George called Ms. Clawson, told her that A. was very upset, and asked her to come

6

over.  When she arrived, she learned that A. was upset because she thought defendant and her mother had been having intercourse.

While defendant was out of the home, Ms. George found two notes in A.'s bedroom that had been written by A.  One note read:  "Dad, do you really want to stop what we are doing because it seems like it.  P.S.  I thought we had something special.  Don't show mom."  The other stated:  "Dad, if it's over, tell me A.S.A.P.  I love you very much.  Love, your lover, A[]."  A. told her mother that she did not give him these notes, but gave him others.

At some point, A. told Ms. Clawson that she and defendant had engaged in long embraces.  She also stated that defendant touched her breasts and digitally penetrated her vagina.

On May 18, 2010, Ms. George told Boliaris that defendant had admitted that he sexually abused A.  Boliaris met with A., who told her that defendant "touched her skin-to-skin on her vagina and that he also touched her on her breasts skin-to-skin and fondled her" in February and March 2010.  Boliaris made a second suspected child abuse report, which was dated May 20, 2010.

On May 19, 2010, Mercier received telephone calls from defendant and Ms. George.  Mercier first spoke to defendant, who stated that he had just told his wife that he was having an affair with A.  When Mercier asked defendant what he meant by an affair, defendant stated that he had kissed and hugged her.  Defendant also told Mercier that he and A. were in the garage around February 1, 2010, when he placed his hands on her breasts and touched her vagina under her clothing.  Defendant stated that "he was feeling vulnerable.  He had stopped smoking marijuana.  And he stated that those were the reasons why he felt like he had allowed that to happen."  He also stated that "he could not keep the secret anymore, that it was killing him."  Mercier told defendant that he would call him back after speaking to Ms. George.

7

Mercier called Ms. George, who asked him to come to the home. When Mercier arrived, he found that Ms. George was very upset. She felt that defendant was at risk of committing suicide. She called defendant, who was barely speaking and threatening to kill himself. Mercier contacted the police. A doctor called defendant and guided him to the hospital.

On May 19, 2010, Ms. George told police that earlier that day defendant had admitted that he previously put his hands down A.'s pants and fondled her in the garage.

On May 20, 2010, A. told the child assault response team (CART) interviewer that defendant had touched her twice over her clothing and asked if he could touch her breasts. A. acknowledged that she did not report everything that had happened during this interview, because she was scared that she would be called a slut or a whore.

On June 25, 2010, A. told Boliaris that while her mother was gone on an overnight trip, defendant backed her into the parents' bedroom, undressed her, fondled her body skin-to skin, kissed her, urged her to fondle his penis, digitally penetrated her, orally copulated her, and partially vaginally penetrated her. Defendant also "directed her to manually masturbate him into his bathroom sink."

On July 1, 2010, A. had a second CART interview. At this interview, A. stated that defendant asked her to come to his bedroom with him, took off her clothes, kissed her, put his finger into her vagina, and touched her breasts. He also asked her to rub his penis.

### B. Defense Case

### 1. A.'s Siblings

Keith testified that he did not get along with his sister, A., though he loved her. He recalled watching a Percy Jackson movie with defendant, A., and Madison. However,

he did not see defendant and A. together in the bedroom. Defendant's door was never locked. He did not recall a time when everyone but defendant and A. went to a movie.

Madison testified that she shared a room with A. According to Madison, A. had behavioral problems, such as arguing and yelling. A. also acted out by trying to jump out of a moving car, kill herself using Madison's scarf, and stab herself with a knife. A. "always" wanted to be the center of attention. Madison remembered watching the Percy Jackson movie with defendant, Ben, Keith, and A. She never saw A. go to defendant's bedroom. Madison saw this movie at a theater and then at home on DVD. A. also went to see the Percy Jackson movie at the theater. There was never a time when her mother took the family to a theater and defendant and A. stayed home.

### 2. CART Interviews

Heather Belton, an investigator with the district attorney's office, conducted two CART interviews with A. in May and July as well as on September 7, 2012 to prepare for trial. A. told Belton that she saw the Percy Jackson movie with Keith and Madison when her mother was out of town. After the movie, Madison went to bed, A. pretended to sleep on the couch, and Keith was on the computer. Defendant distracted Keith while A. went into her parents' bedroom. Defendant entered the bedroom, closed the door, removed A.'s clothes, and kissed her. Defendant was orally copulating A. when Keith entered the bedroom. A. did not move so that Keith would not see her. After Keith left, defendant locked the door.

A. also told Belton that defendant told her that he "was attempting to find her G-spot" and that she "was tight." Defendant did not have a condom but he attempted to have intercourse. They took a shower together and he asked her to orally copulate him. A. complied, because her mother frequently told her to obey her elders. A. became dizzy and defendant ejaculated into the bathroom sink.

9

### 3. Defendant's Testimony

Defendant testified that when A. was adopted, she missed her aunt, who had cared for her. A. eventually "settled in," but the interaction between Ms. George and A. became increasingly difficult. When A. was 10 years old, defendant arranged for his wife and A. to participate in therapy with Boliaris. A. saw Boliaris either bi-weekly or monthly from 2008 to 2010. When A. was 11 years old, her psychiatrist prescribed anti-depressants. A. would sometimes be well-adjusted, and then she began "bullying her siblings or arguing or doing something to cause a disturbance." At the suggestion of Boliaris, defendant and his wife emptied their bedroom walk-in closet so that A. could have time-outs there. However, A.'s symptoms did not improve.

In the early part of 2010, the maternal grandmother, the maternal great-grandparents, and the paternal grandmother were ill. Defendant went on family medical leave from January 1 to March 6, 2010.

In the second week that defendant was on leave, the children were fighting and he had a headache. He was lying on his bed when A. entered the room, grabbed his hand, and started squeezing between his fingers. He tried to pull his hand back and she told him that she was pressure-pointing his hand to relieve his headache. She then stroked his forehead.

In late January or early February 2010, A. kissed him on the lips. Defendant told her that he did not like her kissing him on the lips. However, it happened again about a week later.

In the second week in February 2010, A. walked into the garage and announced to defendant and Madison that she had made lunch. After Madison left, A. said, "Hey, Dad, you look really sad, you look like you need a hug." They put their arms around each other, and A. started to kiss him. When defendant started to push her away, she grabbed his hand and placed it on her chest. After he yanked his hand back, she brought it

10

towards her waist. Defendant pulled his hand back again and said, "What are you doing? This is crazy." In response, A. grabbed his crotch and said, "You don't understand, Dad, this is just what I want." When Madison walked in, A. walked away. His wife was not at home during this incident. Defendant gave this description of the incident to both Mercier and his wife.

About two weeks after the incident in the garage, defendant was lying in bed late at night or early in the morning when he heard his bedroom door close. He thought his wife had returned from her trip to Capitola. He next realized that someone was lying on top of him, which was not something that his wife would do. When he made a noise, A. said, "Don't worry, Dad, it's me, A[.]" Defendant was in shock and told her to get out of the room. Defendant grabbed her by the wrists and slid her to the floor. A. took what he assumed were her clothes and left. Defendant felt dizzy and disgusted, and vomited in the bathroom sink and the garbage can.

When his wife returned from Capitola, defendant and A. were skateboarding and he knew that she would be upset that Madison was watching the younger children. He knew that it was not a good idea to have Madison watch the children, because she was not the most responsible child at the time.

Defendant kept telling A. that the relationship that she wanted was not possible because he was her father. She replied, "No, you're not my father, you're just the person that adopted me and my siblings." According to defendant, he never encouraged A. to have a relationship with him other than an appropriate father/daughter relationship.

Sometime in January 2010, defendant learned from A. that she had accessed pornography on the upstairs computer. A. was concerned that her mother would find out and become abusive. Defendant admonished A. and agreed not to tell his wife. This was the only incident in which he and A. made a pinkie swear.

11

Defendant did not immediately tell his wife about A.'s behavior, because he felt "trapped," "embarrassed," and "ashamed." He feared that once his wife heard about A.'s behavior, she would force A. to leave the house and go into a group home. When he told his wife about the incident in which A. placed his hand on her breast, she hung up on him.

In early March, an "inappropriate kissing referral" was made to CPS. He worked with Mercier and CPS to develop a safety plan and he complied with the plan. In mid-March, his wife became upset and moved to a hotel with the children. Defendant told her that he preferred that they return to the house, which they did, and he moved out of the house.

After defendant had meetings with his wife, CPS, and Boliaris, he returned to the family home in early April. However, he was asked to leave the house in late April. Defendant moved to a trailer park for a couple of weeks. In early May, after receiving the approval of CPS, he moved in with the Clawsons.

When he spoke with Mercier on May 19, 2010, defendant was sitting in his truck at a job site. He was particularly depressed, because he was losing his job and housing. He tried to kill himself by opening a canister of carbon dioxide in his truck and closing the windows. After the call from Mercier, defendant received a call from his wife. She was crying and he was having trouble breathing, deeply depressed, and not communicating. He remembered a doctor giving him directions to a hospital.

Defendant denied that he attempted sexual intercourse with A., inappropriately touched her, inappropriately kissed her, made inappropriate comments to her, and introduced her to pornography,

A. continued to pursue defendant even after the trial court had issued a protective order. In June 2010, A. called him when he was released from jail. In October 2012, defendant was working at a booth with some other adults at the county fair. A. came by

12

the booth, and once she saw defendant, she would not leave the area. A few adults asked her to leave, but she kept returning to his booth.

A. last spoke to defendant three years ago. She said, "You've left me and I hate you."

### C. Prosecution Rebuttal Case

A. denied taking defendant's hand and putting it on her body during the incident in the garage. She attended the county fair in October 2012. When she saw defendant, she "started freaking out" and told her friend that they needed to leave. They left. She did not make any attempt to contact him.

### D. Defense Surrebuttal Case

In October 2012, William Schwartz was working with defendant at the booth at the county fair. A. came with some friends to the booth and circled around the booth for about 20 minutes. One of the adults told A. that she needed to leave because defendant was there. She "made another trip around the booth and presented herself in a way that made [defendant] very uncomfortable."

### III.  Discussion

Defendant contends that the judgment must be reversed, because the trial court failed to give a unanimity instruction (CALCRIM No. 3501).[7]

---

[7]     CALCRIM No. 3501 states: "The defendant is charged with <insert description[s] of alleged offense[s]> [in Count[s] ___] sometime during the period of ___ to ___. [¶] The People have presented evidence of more than one act to prove that the defendant committed (this/these) offense[s]. You must not find the defendant guilty unless: [¶] 1. You all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act (he/she) committed [for each offense]; [¶] OR
(*Continued*)

13

"In a criminal case, a jury verdict must be unanimous. [Citations.] . . . Additionally, the jury must agree unanimously the defendant is guilty of a *specific* crime. [Citation.] Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) "If the prosecution is to communicate an election to the jury, its statement must be made with as much clarity and directness as would a judge in giving instruction. The record must show that by virtue of the prosecutor's statement, the jurors were informed of their duty to render a unanimous decision as to a particular unlawful act." (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1539 (*Melhado*).) We independently review whether the trial court's failure to give a unanimity instruction was error. (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 568.)

Here, defendant was charged in counts 1 through 4 with lewd acts upon a child under 14. The complaint charged that defendant committed: count 1 "[o]n or about February 1, 2010"; count 2 "[o]n or about February 8, 2010"; count 3 "[o]n or about February 15, 2010"; and count 4 "[o]n or about February 20, 2010." It was also alleged that defendant engaged in substantial sexual conduct with the victim in connection with count 4. Defendant was charged in count 5 with forcible rape, in count 6 with sexual penetration by foreign object, in count 7 with aggravated sexual assault of a child (rape), and in count 8 with aggravated sexual assault of a child (sexual penetration). Counts 5 through 8 were alleged to have occurred "[o]n or about February 20, 2010."

In closing argument to the jury, the prosecutor stated: "Now, with regard to Counts 1, 2, 3 and 4, you heard the testimony initially about the couch incident. That

_____

[¶] 2. You all agree that the People have proved that the defendant committed all the acts alleged to have occurred during this time period [and have proved that the defendant committed at least the number of offenses charged]."

14

happened in the morning when A. was making noise upstairs and her father brought her down to the couch shortly before he left for work. You heard testimony that he at that point touched her on her breast. Touched her on her vaginal area. It started out by cuddling. [¶] Count 2, another count of lewd and lascivious conduct. Her testimony about the garage. Now Mr. George claims that A. put his hand on her. She denied that. . . . [¶] . . . You also heard testimony about an open-mouthed kiss like a boyfriend or girlfriend would kiss each other."

The prosecutor stated: "[O]n the Count 3, we'll address the Percy Jackson incident. Now, in that incident A. testified that her mom took the other kids to the movie . . . . A. talked about an act of vaginal penetration and . . . Mr. George having her put her hands on him so that he can ejaculate into a sink." Regarding count 4, the prosecutor made no election. She argued that count 4 occurred on the same evening as counts 5, 6, 7, and 8, that is, February 20, 2010 when Ms. George stayed overnight in Capitola.

The trial court did not give a unanimity instruction, and none was requested.

As the Attorney General concedes, the prosecutor was unsuccessful in communicating which specific act she was relying on to prove each charge to the jury. During deliberations, the jury sent a note which read: "Could we receive some clarification about the 'counts' we are deciding on? Do we need to know a specific incident relating to a 'count?'" In court, the foreperson stated: "We don't understand what Count 1 is, what Count 2 is, what Count 3 is. That's what we're having difficulty trying to figure out exactly what i[t] i[s]." After the trial court explained that count 1 concerned a violation of section 288, subdivision (a), the foreperson responded, "I understand. Let me rephrase my question. Does Count 1 refer to what happened in the bedroom? Does it refer to what happened in the garage? Does it refer to what happened when she was out in Santa Cruz or whatever? That's what we're trying to figure out." The trial court stated, "It's not specified and it's not specified on the Complaint either.

15

So the Complaint won't help you. Okay. I think I see your question now. There are four separate incidences. They have dates but those dates are approximate, as I mentioned. You have the instruction on that."[8] The trial court offered to provide the jury with a copy of the complaint, which would specify the dates. The foreperson responded, "I think that would help us." There was no objection and the complaint was given to the jury.

The jury convicted defendant of counts 1 and 4, found the substantial sexual conduct allegation for count 4 to be true, and acquitted him of counts 2, 3, 5, and 7. The jury did not reach a verdict for counts 6 and 8. After defendant brought a motion for new trial, the court concluded that it did not have a sua sponte duty to give the unanimity instruction as to counts 1 and 4. However, it found error regarding the substantial sexual conduct finding.

Here, as the Attorney General concedes, A. testified that there were more than four separate incidents of lewd conduct. Thus, the trial court had a sua sponte duty to give the unanimity instruction after the jury expressed confusion as to which act applied to each count. (*Melhado*, *supra*, 60 Cal.App.4th at p. 1534.) The Attorney General argues that the error was harmless under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*).

There is a split of authority on whether the state law harmless error standard articulated in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*) or the federal constitutional error standard articulated in *Chapman*, *supra*, 386 U.S. 18 applies to the failure to instruct on unanimity. (See *People v. Milosavljevic* (2010) 183 Cal.App.4th 640, 647 (*Milosavljevic*).) "'Under the *Watson* standard, prejudicial error is shown where "'"after an examination of the entire cause, including the evidence," [the reviewing

---

[8]     The trial court had instructed the jury:  "It is alleged that these crimes occurred February 1, 2010, February 8, 2010, February 15, 2010, and February 20, 2010.  The People are not required to prove that the crimes took place exactly on those days but only that they happened reasonably close to those days."

court] is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' [Citation.]"'" (*People v. Wilkins* (2013) 56 Cal.4th 333, 351.) Under *Chapman*, reversal is required unless the error was harmless beyond a reasonable doubt. (*Milosavljevic*, at p. 647.)

Here, under either standard, we find the error was prejudicial. Based on A.'s testimony, some jurors could have concluded that count 1 was the first incident and count 4 was the fourth incident, while others could have concluded that defendant was guilty of the acts about which he made admissions. Still other jurors could have found that count 4 referred to the final incident. Jurors could also have concluded that defendant committed the acts occurring close to the dates "[o]n or about" February 1, and 20, 2010, as alleged in counts 1 and 4.

The Attorney General argues, however, that count 1 charged the earliest or first lewd act while count 4 charged the last incident, which the evidence showed occurred on February 20, 2010. There is nothing in the record to indicate that the jury took this approach. Even if we assume that the jurors used the approach advocated by the Attorney General and concluded that count 1 applied to the first incident, it is not clear when the first incident was. A. testified that the first incident occurred on the couch on February 14, 2010, but she also testified that this incident occurred sometime after February 14, 2010. Some jurors could have concluded that count 1 corresponded to the couch incident. But others could have concluded that count 3 corresponded to the couch incident, which was closer to being "on or about" February 15. These jurors could have found defendant guilty of count 1 based on his admission to Mercier that the first lewd act occurred "around February 1, 2010" in the garage when he placed his hands on her breasts and touched her vagina under her clothing. Moreover, A. also testified that she and defendant were exchanging inappropriate kisses in defendant's bedroom on February 14, 2010. Thus, some jurors could have concluded that this was the first

17

incident of lewd conduct and corresponded to count 1, because they believed that the couch incident occurred sometime after February 14, 2010.

As to count 4, the complaint alleged that it occurred on or about February 20, 2010. Counts 5 through 8 alleged the same approximate date. The Attorney General points out that A. testified that the last incident of inappropriate behavior occurred when her mother took an overnight trip to Capitola, and Ms. George testified that she was away on the evening of February 20, 2010. Thus, the Attorney General argues that the jury would have focused on what occurred on February 20, 2010, to determine whether defendant was guilty of counts 4 through 8. However, the jury found defendant not guilty of counts 5 and 7 and did not reach a verdict on counts 6 and 8. Some jurors could have concluded that defendant was guilty of lewd conduct and not the other acts alleged by A. on that evening. But other jurors could have focused on the fourth incident, concluded that count 4 corresponded to the incident in her bedroom when the other family members were at the Percy Jackson movie, and convicted defendant based on those acts.

In sum, given that the jury did not believe all of A.'s testimony and the conflicting testimony on the dates of the incidents, it is reasonably probable that a different result would have been reached if the jury had been given a unanimity instruction (*Watson*, *supra*, 46 Cal.2d at p. 836), and the trial court's failure to give a unanimity instruction was not harmless beyond a reasonable doubt. (*Chapman*, *supra*, 386 U.S. at p. 24.)[9]

---

[9]     Defendant also challenges the constitutionality of former CALCRIM No. 1110. He contends that the language in this instruction which stated that "the touching need not be done in a lewd or sexual manner" negated the requirement of finding that he committed the act with lewd intent. In the event that this case is retried, we need not consider this issue, because that language has been removed from the current version of CALCRIM No. 1110.

## IV. Disposition

The judgment is reversed.

_____

Mihara, J.

WE CONCUR:

_____

Bamattre-Manoukian, Acting P. J.

_____

Márquez, J.

20