Filed 5/27/22  P. v. Ohlinger CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>WILLIAM DEXTER OHLINGER,<br><br>      Defendant and Appellant. | D078839<br><br><br><br>(Super. Ct. No. FVI19002547) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Michael A. Smith, Judge.  Affirmed in part; reversed in part, with instructions.

Steven A. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Arlene A. Sedival, Assistant Attorney General, Steve Oetting and Heather B. Arambarri, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant William Dexter Ohlinger was sentenced to 22 years in prison based on a 20-count amended information that included multiple enhancements for crimes he committed between April and September 2019. These crimes were committed by Ohlinger while a member of the White Power Gangsters (WPG), and included robbery, burglary, possession of a firearm and live ammunition, transportation of methamphetamine for sale, false impersonation, felony evasion, and participation in a criminal street gang. By mid-2019, WPG had committed about 80 robberies and burglaries of marijuana grow houses, with the proceeds benefitting WPG and the Aryan Brotherhood prison gang. All of the crimes in this case were investigated by the San Bernardino County Sheriff's Department.

On appeal, Ohlinger contends: (1) the trial court erred in failing to instruct the jury sua sponte on unanimity for second degree robbery (count 18); (2) insufficient evidence supports his conviction for transportation of methamphetamine for sale (count 7); and (3) the trial court erred in not staying various counts under former Penal Code section 654, subdivision (a).[1]

In supplemental briefing, Ohlinger contends Assembly Bill Nos. 518 and 124, and Senate Bill No. 567, each effective January 1, 2022, retroactively apply to this case under the *Estrada*[2] rule; and therefore, he is entitled to resentencing on various counts based on changes to sections 654 and 1170. He further contends that Assembly Bill No. 333 (also effective January 1, 2022) changed the evidentiary and procedural requirements for the substantive gang offense (§ 186.22, subd. (a)) and the gang enhancements

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

[2] *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*).

(*id.*, subd. (b)), and retroactively applies in this case and entitles him to a reversal of the gang enhancements imposed under the former law.

The People in their supplemental brief agree these legislative enactments retroactively apply to Ohlinger's case; that the convictions on the gang enhancements must be reversed, subject to retrial by the People; and that his sentence on various counts must be vacated and that Ohlinger be resentenced in accordance with the new laws.

As we explain, we conclude the trial court was not required to give a unanimity instruction for Ohlinger's robbery conviction; and substantial evidence supports his conviction for transportation of methamphetamine for sale.

We further conclude the new laws retroactively apply to Ohlinger. As such, we (1) reverse the true findings on Ohlinger's gang enhancements, which the People may retry in accordance with Assembly Bill No. 333; and (2) vacate his sentence on various counts, as we will explain, to allow the trial court to resentence him in accordance with Assembly Bill Nos. 518 and 124, and Senate Bill No. 567. In all other respects we affirm the judgment.

## FACTUAL OVERVIEW

### 1. April 21

M.F. testified that on April 21, 2019,[3] she saw a black Chevrolet Camaro and a Ford F-150 parked in front of her neighbor's home. As M.F. approached the home, she was met by a man who claimed to be a "detective from a joint task force." The man said his name was "Glen" and showed M.F. his police badge. M.F. saw that the man was carrying a gun and as they

---

[3] As noted, all of the crimes in this case took place in 2019.

talked, she saw another man taking "stuff" from the home and putting it under a tarp in the bed of the F-150.

A short while later, M.F. saw deputies with guns drawn at her neighbor's home. M.F. told a deputy about her conversation with "Glen." On May 1, M.F. was shown a six-pack of photographs and picked out Ohlinger as the man she had spoken with on April 21.

### 2. April 26 (Counts 1-9)

Sheriff deputies assigned to the "gang team" were conducting surveillance at a home on April 26 looking for a wanted individual (not Ohlinger). During the surveillance, deputies observed a silver Camry and a black Camaro leave the residence. One of the deputies believed the man driving the Camaro may have been involved in a recent shooting incident at a cannabis cultivation operation. The man, who had identified himself to investigators as a member of the marijuana eradication team, also drove a black "soft top" Camaro.

Deputies followed the vehicles, attempting to identify their occupants to determine if the person of interest was inside. Both vehicles were lawfully stopped. Ohlinger was found to be the driver of the Camaro. Initially, he gave false identification to the deputies, handing them a California driver's license belonging to "Glenn Rock."

During the stop, Ohlinger was searched and found to be in possession of a firearm and 11.2 grams of methamphetamine (including packaging). He consented to a search of the vehicle and inside the vehicle, deputies found a "security badge which consisted of a gold seven-point star similar to" a sheriff's department badge; two unused hypodermic needles; and several bank access cards, none of which bore Ohlinger's name.

4

In the vehicle's trunk, deputies found a loaded "black Maverick 88 pump-action shotgun" with its serial number "obliterated" and its barrel "sawed-off"; an ammunition can; three ballistic vests; two "nylon law enforcement style duty belts"; and "law enforcement style black boots." Inside the ammunition can deputies discovered more than 200 live rounds of .40 caliber, and more than 60 live rounds of .233 rifle, ammunition. Also in the trunk, deputies found two fully loaded handgun magazines; three rifle magazines, one of which was loaded with "green tip ammunition" capable of piercing "steel plating or armor"; several pairs of handcuffs; a "retractable expandable metal baton"; and a digital scale.

On April 27, deputies conducted a lawful search of the residence they had surveilled the previous day and discovered a cannabis cultivation operation.

### 3. July 2 (Counts 10-11, 13-14)

While on routine patrol on July 2, a deputy was dispatched to an intersection to investigate the report of a stolen vehicle, described as a maroon, 2007 Chrysler 300. The deputy spotted a vehicle matching that description and attempted a traffic stop by activating his patrol vehicle's overhead lights and siren. The driver of the Chrysler 300 sped off, leading deputies on about a 20-mile pursuit that reached speeds of up to 125 miles per hour.

With the aid of a police helicopter, the Chrysler 300 was surveilled until it crashed into a berm. Its driver, later identified as Ohlinger, exited the vehicle and fled on foot. Deputies caught up to Ohlinger, who gave up without further incident.

Once in custody, deputies searched Ohlinger and found 20 unspent rounds of .22 caliber ammunition in one of his pockets. Deputies also

5

searched the vehicle and found more live ammunition; and a rifle bag containing a scope, a correctional badge, a laser, and what appeared to be a methamphetamine pipe.

### 4. July 24 (Counts 15-16)

While on routine patrol at about 1:00 a.m. on July 24, a deputy observed a silver Infiniti with a broken front headlamp traveling in the opposite direction. The Infiniti crossed over double yellow lines before entering an intersection. The deputy made a U-turn, activated the overhead lights and siren from his patrol vehicle, and attempted to stop the Infiniti. The driver, later identified as Ohlinger, did not stop, but instead continued traveling (below the speed limit) through multiple intersections, crossing double yellow lines, and passing vehicles on the right-hand side. Ohlinger finally pulled to the right hand shoulder and stopped.

Following Ohlinger's arrest, the deputy searched the Infiniti and found six government-issued identification cards, each one bearing a different name but with the same photograph; eight rounds of 9-millimeter, and 10 rounds of .223 caliber, ammunition.

### 5. August 12 (Count 17)

B.A. told the jury he returned from work the evening of August 12 and found the front door of his home ajar, and the back door "cracked open" in what appeared to be a forced entry. Once inside, B.A. saw the home had been ransacked and many items missing, including guitars, tools, a computer, and a shotgun.

A camera by the front door recorded video that B.A. retrieved and shared with deputies. The video was played for the jury. According to B.A.'s testimony, the video showed a person coming to his front door, "ripping" down one of the outdoor cameras, and a young man standing a distance away by a

6

pickup truck.  A deputy reviewed the surveillance video and a "screenshot" of the two suspects.  Ohlinger was identified as one of the suspects in the screenshot.

### 6. September 19 (counts 18-20)

James Kendall testified he was in custody for an incident with Ohlinger that occurred in the evening of September 19.[4]  Earlier that day, while driving with his girlfriend, Kendall smelled what he believed was marijuana coming from a "grow house."  Kendall directed his girlfriend to notify Ohlinger about the home.  At some point later that day, Kendall and Ohlinger met up and Ohlinger suggested they "do it" that night.

Sometime after 10:00 p.m., Kendall and Ohlinger separately drove to the suspected grow house.  Ohlinger was wearing a bulletproof vest and was armed with an AR-15 rifle.  Kendall was armed with a .45 Glock.  Kendall's girlfriend accompanied him, while Ohlinger had a female and a male named "Cody" as passengers.

Once they arrived at the grow house, Kendall told his girlfriend and the other female to take Kendall's vehicle and drive around the block, as Kendall did not "want the girls there."  Although Kendall and Ohlinger were armed, Cody was not.  The three men jumped a perimeter fence, scouted the house, and concluded it was a "grow op" based on the smell emanating from the home.

Kendall testified he had misgivings about going inside the home, as he felt there were "eyes" on them.  Ohlinger, however, instructed Cody to use a crowbar to pry open the backdoor.  Ohlinger and Cody entered first, while Kendall waited outside by the back door.  Once inside, Kendall saw Cody

---

[4]    Kendall was given "use immunity" in return for his agreement to testify in this case.

escorting the occupant of the home, later identified as Hong Huang, into one of the grow rooms. Ohlinger told Kendall and Cody to instruct Huang to cut down the marijuana plants.

While Huang cut down the plants, Kendall received a phone call from his girlfriend. In a "real panic," she reported there were people "chasing her in a car, shooting at her with weapons." Kendall informed Ohlinger. Ohlinger, who was in possession of Huang's cellphone, handed the cellphone to Huang and insisted he call his (Huang's) "boss." Huang made a call, and Ohlinger got on the line and told whoever had received the call to "stand down." Ohlinger then instructed Huang to continue cutting down the marijuana plants, as Cody bundled them up. Kendall took the bundles of marijuana to the front door of the home.

As he continued to move the bundles of marijuana, Kendall saw lights outside by the front gate. Kendall initially believed the lights were from Huang's companions, but then realized they were spotlights from a deputy's patrol vehicle. In response, Kendall and Ohlinger sought to "hide [their] weapons." Kendall watched as Ohlinger broke down his rifle into pieces and hid them in some sort of "filter." Kendall hid the Glock in a "side room by the kitchen." Kendall then went into the "kitchen," laid face-down on a mattress, and waited for the police.

Huang (through an interpreter) testified he had been working at the grow house for about a month; was paid $3,000 to water the marijuana plants every two or three days; and over the course of that month, had spent only about three or four nights at the home, as it was not his permanent residence.[5]

---

[5] Huang, like Kendall, was given use immunity for his testimony in this case.

In the evening of September 19, Huang was inside the bathroom getting ready to take a shower when "two or three" people entered the home. Huang could not be sure of the number of intruders, nor could he identify them at the time of the incident or at trial, because it was "kind of dark" and he could "not see clearly." However, Huang did notice one of the men "looked like a police officer," as the man was wearing a "badge" and "body armor."

Once directed into the garage, Huang saw the two men had guns. They gave Huang a pair of scissors and told him to cut down the marijuana plants. The armed men then wrapped up the marijuana and moved it to the front door. After Huang cut down the plants, the two men bound his hands with tape. It was then police arrived.

Deputies were dispatched to the grow house at about midnight. While enroute, deputies were informed of shots being fired and a flare being shot into the air near the home. Once backup arrived, deputies entered the home and took Kendall into custody without incident. The deputies subsequently located Ohlinger in a bathroom, and he too was taken into custody without incident.

Deputies searched the home and recovered a loaded Glock 21; a "security badge holder and . . . metal sergeant rank insignia[s]"; a cellphone; a bulletproof vest; and an AR-15 magazine containing 28 rounds of ammunition hidden in loose dirt in a container used to grow marijuana.

Deputies also searched a black Honda parked outside the perimeter fence of the home. In the vehicle's back cargo area, they found a rifle case and a duty style pistol holder. Inside the rifle case they found a "muzzle break" for an AR-15 rifle, a "small quantity" of methamphetamine, and a loaded .22 rifle magazine containing 13 rounds of "long rifle [ammunition]." Also inside the vehicle deputies found an unloaded 10-round AR-15

magazine; two 9 millimeter unloaded Glock magazines; "numerous driver's licenses belonging to various people"; and trash bags filled with marijuana.[6]

## PROCEDURAL HISTORY

A jury convicted Ohlinger of the following crimes:

Counts 1-2 and 20:  Felon in possession of a firearm (§ 29800, subd. (a)(1));

Counts 3-5 and 13-15:  Felon in possession of live ammunition (§ 30305, subd. (a)(1));

Count 6:  Possession of methamphetamine while armed (Health & Saf. Code, § 11370.1, subd. (a));

Count 7:  Transportation of methamphetamine for sale (Health & Saf. Code, § 11379, subd. (a));

Count 8:  Possession of a loaded firearm (§ 25850, subd. (a));

Count 9:  False impersonation (§ 529);

Counts 10 and 16:  Felony evasion (Veh. Code, § 2800.2, subd. (a));

Count 11:  Illegally taking or driving a vehicle (Veh. Code, § 10851, subd. (a));

Count 17:  Residential burglary (§ 459);

Count 18:  Robbery (§ 211); and

Count 19:  Participation in a criminal street gang (former § 186.22, subd. (a)).[7]

---

[6]    Evidence of gang activity by Ohlinger was also presented at trial.  This evidence included jailhouse recordings of phone calls between Ohlinger and another WPG member discussing the gang.  In light of our decision reversing the gang enhancements (§ 186.22, subd. (b)—counts 1-9 and 18) as discussed *post*, we find it unnecessary to summarize the gang evidence in this opinion.

[7]    Following the jury verdicts, the court dismissed count 19 at the People's request.

The jury, and, in one instance, the court, also found true a number of enhancements. As to counts 1-9 and 18, the jury found true allegations that Ohlinger committed the crimes for the benefit of, at the direction of, or in association with a criminal street gang (former § 186.22, subd. (b)). As to count 18, the court found true that Ohlinger had committed the offense while released on bail (§ 12022.1, subd. (b)), after Ohlinger waived his right to a jury trial on this particular enhancement.

The court sentenced Ohlinger as follows to 22 years in prison: On count 18 for second degree robbery (deemed the primary count), the upper term of five years, plus 10 years for the firearm enhancement and two years for the on-bail enhancement; on count 6, a consecutive one-year term plus one year for the gang enhancement; on count 10, a consecutive one-year term; on count 11, a consecutive eight-month term; and on count 17, a consecutive 16-month term.

The trial court also imposed concurrent two-year terms, plus a three-year gang enhancement, on counts 1 through 5 and 7; a concurrent three-year term, plus a three-year gang enhancement, on counts 8 and 9; and a concurrent two-year term on counts 13 through 16 and 20.

11

## DISCUSSION

## I. Unanimity Instruction

### A. Additional Background

After the close of evidence and outside the presence of the jury, the trial court held a hearing on Ohlinger's section 1118.1 motion.[8] As relevant here, the trial court found the evidence was insufficient to support first degree robbery on count 18 because Huang was not using the grow house for "dwelling purposes" but instead it "was his place of work." The trial court, however, found there was sufficient evidence to support second degree robbery for the jury's determination.[9]

During the section 1118.1 hearing, the parties discussed jury instructions pertaining to second degree robbery. The trial court noted the marijuana plants had been cut down, bundled up, and "piled up at the front door ready to be taken out of the residence." The court found this evidence was sufficient to support a taking.

Defense counsel then asked whether the People intended to argue Ohlinger's retention of Huang's cellphone during the robbery also supported a taking. The court responded robbery (and the lesser-included offense of

---

[8]     Section 1118.1 provides: "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal. If such a motion for judgment of acquittal at the close of the evidence offered by the prosecution is not granted, the defendant may offer evidence without first having reserved that right."

[9]     Pursuant to section 1118.1, the court also dismissed count 12, receiving a stolen vehicle (§ 496, subd. (d)).

12

attempted robbery) could be based on the taking of either the marijuana plants or the cellphone. The prosecutor agreed, adding, "And I don't believe that that would require any sort of unanimity instruction or anything." Defense counsel agreed that a unanimity instruction was unnecessary.

The court instructed the jury with CALCRIM No. 1600, "Robbery (Pen. Code, § 211)."[10] During closing, the prosecutor argued that Ohlinger could be guilty of second degree robbery as a result of either his taking control of, and his instruction to cut down, the marijuana plants, or his possession of Huang's cellphone, as in both instances the "property was moved some distance." The prosecutor added, "It doesn't have to be a significant distance. It could be a matter of feet"; and, "Either way the defendant is still guilty of robbery."

---

[10] The court gave CALCRIM No. 1600 in relevant part as follows: "The defendant is charged [in count] 18 with robbery [in violation of Penal Code section 211]. To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant took property that was not his own; [¶] 2. The property was in the possession of another person; [¶] 3. The property was taken from the other person or his immediate presence; [¶] 4. The property was taken against that person's will; [¶] 5. The defendant used force or fear to take the property or to prevent the person from resisting; [¶] AND [¶] 6. When the defendant used force or, fear, he intended to deprive the owner of the property permanently or to remove the property from the owner's possession for so extended a period of time that the owner would be deprived of a major portion of the value or enjoyment of the property.

"The defendant's intent to take the property must have been formed before or during the time he used force or fear. If the defendant did not form this required intent until after using the force or fear, then [he] did not commit robbery.

"[If you find the defendant guilty of robbery, it is robbery of the second degree.]

"[A person *takes* something when he or she gains possession of it and moves it some distance. The distance moved may be short.]"

Ohlinger contends on appeal the prosecutor's argument that the taking for purposes of second degree robbery could be satisfied either by Ohlinger's control of the marijuana plants or his possession of Huang's cellphone required a unanimity instruction such as in CALCRIM No. 3500.[11] We disagree.

## B.  Guiding Principles

A criminal defendant has a constitutional right to a unanimous jury verdict, meaning "the jury must agree unanimously the defendant is guilty of a *specific* crime." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132 (*Russo*).) Thus, "if one criminal act is charged, but the evidence tends to show the commission of more than one such act, '*either* the prosecution must elect the specific act relied upon to prove the charge to the jury, *or* the court must instruct the jury that it must unanimously agree that the defendant committed the same specific criminal act.' " (*People v. Napoles* (2002) 104 Cal.App.4th 108, 114.)  In such a case, where no election has been made by the prosecution, the trial court possesses a sua sponte duty to provide a unanimity instruction. (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 274-275.)

However, there are exceptions to this instructional duty:  "For example, no unanimity instruction is required if the case falls within the continuous-course-of-conduct exception, which arises 'when the acts are so closely

---

11     CALCRIM No. 3500 provides:  "The defendant is charged with *<insert description of alleged offense>* [in Count __ ] [sometime during the period of __ to __]. [¶] The People have presented evidence of more than one act to prove that the defendant committed this offense.  You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act (he/she) committed."

14

connected in time as to form part of one transaction' [citation], or . . . 'when the statute contemplates a continuous course of conduct of a series of acts over a period of time.' [Citation.] There also is no need for a unanimity instruction if the defendant offers the same defense or defenses to the various acts constituting the charged crime." (*People v. Jennings* (2010) 50 Cal.4th 616, 679 (*Jennings*).) We review de novo whether the trial court erred in failing to give a unanimity instruction. (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 568 (*Hernandez*).)

### C. Analysis

We conclude the continuous-course-of-conduct exception applies in this case because the facts demonstrate " ' "the acts alleged are so closely connected" ' " they formed part of one and the same transaction, and thus, one offense. (*People v. Williams* (2013) 56 Cal.4th 630, 682 (*Williams*).) "[A] continuous course of conduct exists when the same actor performs the same type of conduct at the same place within a short period of time, such that a jury cannot reasonably distinguish different instances of conduct." (*Hernandez, supra*, 217 Cal.App.4th at p. 573.)

Here, Ohlinger's instruction to cut down the marijuana plants from inside the garage and other rooms in the grow house and move them to the front door, and his act of taking possession of Huang's cellphone and keeping it throughout the robbery of the marijuana, including at one point using it to talk to Huang's "boss" and ordering him or her to "stand down," were the result of a "continuous course of conduct." (See *Williams, supra*, 56 Cal.4th at p. 682; *Jennings, supra*, 50 Cal.4th at p. 679.)

Our conclusion no unanimity instruction was required in this case finds support in *Russo*: "The key to deciding whether to give the unanimity instruction lies in considering its purpose. The jury must agree on a

15

'particular crime' [citation]; it would be unacceptable if some jurors believed the defendant guilty of one crime and other jurors believed [him or] her guilty of another. But unanimity *as to exactly how the crime was committed is not required.* Thus, the unanimity instruction is appropriate 'when conviction on a single count could be based on two or more discrete criminal events,' but *not* 'where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event.' [Citation.] In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime. In the first situation, *but not the second,* it should give the unanimity instruction." (*Russo, supra,* 25 Cal.4th at pp. 1134-1135, italics added.)

In the instant case, there was one criminal "event," a "single discrete crime" that was committed in the *same* place against the *same* victim within a short time-span. (See *Russo*, *supra*, 25 Cal.4th at pp. 1134-1135; *Hernandez*, *supra*, 217 Cal.App.4th at p. 573.) Ohlinger may not parse out each stage of the robbery into distinct criminal acts and then require the jury be instructed to agree on which of these acts constituted the taking for purposes of this offense. (See *People v. Flores* (2007) 157 Cal.App.4th 216, 223 [no unanimity instruction required where the defendant fired multiple rounds using the same firearm in the same location, as there was no reasonable basis for the jury to distinguish between each gunshot for purposes of assault with a semiautomatic weapon]; *People v. Percelle* (2005) 126 Cal.App.4th 164, 181-182 (*Percelle*) [no unanimity instruction required where the defendant twice within an hour attempted to purchase 60 cartons of cigarettes with the same fraudulent credit card, and where the defendant

offered the same defense to both acts, which the jury rejected in toto in rendering a guilty verdict].)

In addition, even if required, we find the failure to give a unanimity instruction harmless under the circumstances of this case because Ohlinger offered the same defense to each of the acts constituting the robbery. (See *Jennings*, *supra*, 50 Cal.4th at p. 679 [unanimity not required if the defendant offers the same defense to the various acts constituting the crime]; *Percelle*, *supra*, 126 Cal.App.4th at pp. 181-182.)

During closing argument, defense counsel focused on the robbery charge and argued Huang was unable to identify Ohlinger as one of the participants in the crime, while also arguing that Huang stated only two people participated in the robbery, in contravention of Kendall's testimony that there were three participants. Defense counsel argued the "discrepancy" between the testimony of Huang and Kendall suggested Ohlinger did not participate in the "robbery to the degree that is necessary" for its commission, as either a direct participant or as an aider and abettor. Instead, defense counsel argued it was Kendall and not Ohlinger who planned and carried out the robbery with Cody; as Kendall found the grow house; Kendall (through his girlfriend) told Ohlinger about the operation; and Kendall took Ohlinger to the home later that evening.

However, as the trier of fact, it was up to the jury to decide whether or not Ohlinger participated in the robbery based on his instruction to cut, bundle, and transport the marijuana plants to the front door, or his taking of Huang's cellphone and his keeping it throughout the robbery of the marijuana. Clearly, the jury rejected Ohlinger's only defense—that he was not an active participant in either of these acts during the commission of this offense. (See *Jennings*, *supra*, 50 Cal.4th at p. 679; see also *Hernandez*,

17

*supra*, 217 Cal.App.4th at p. 577.) As such, for this separate reason we reject this claim, as any purported error in failing to give a unanimity instruction was harmless.

## II. Sufficiency of the Evidence

Ohlinger next contends the evidence was insufficient to support his conviction on count 7, transportation for sale of methamphetamine. We disagree.

### A. *Guiding Principles*

" 'In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] . . . We do not reweigh evidence or reevaluate a witness's credibility.' [Citations.] 'Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.' " (*People v. Brown* (2014) 59 Cal.4th 86, 105-106.)

Moreover, if the record contains substantial evidence from which a reasonable trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt, "the possibility that the trier of fact might reasonably have reached a different conclusion does not warrant reversal." (*People v. Taylor* (2004) 119 Cal.App.4th 628, 639 (*Taylor*); see *People v. Zamudio* (2008) 43 Cal.4th 327, 358 (*Zamudio*) ["Where the circumstances

18

reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal."].)

To be convicted of transporting methamphetamine for sale, the prosecution must prove beyond a reasonable doubt the defendant transported methamphetamine, knew of its presence and its nature as a controlled substance, and the methamphetamine was a useable amount.  (See Health & Saf. Code, § 11379, subds. (a), (c);[12] see also CALCRIM No. 2300[13] [stating the elements of transportation for sale].)

"Intent to sell may be established by circumstantial evidence."  (*People v. Harris* (2000) 83 Cal.App.4th 371, 374 (*Harris*).)  " 'In cases involving possession of marijuana or [methamphetamine], experienced officers may give their opinion that the narcotics are held for purposes of sale based upon

_____

[12]    Subdivision (a) of Health & Safety Code section 11379 provides in part: "[E]very person who transports, imports into this state, sells, furnishes, administers, or gives away, or offers to transport, import into this state, sell, furnish, administer, or give away, or attempts to import into this state or transport any controlled substance [as defined by statute], unless upon the prescription of a physician, dentist, podiatrist, or veterinarian, licensed to practice in this state, shall be punished by imprisonment pursuant to subdivision (h) of Section 1170 of the Penal Code for a period of two, three, or four years."  Subdivision (c) of this statute provides:  "For purposes of this section, 'transports' means to transport for sale."

[13]    The court gave CALCRIM No. 2300 in relevant part as follows:  "The defendant is charged in Count 7 with transporting for sale a controlled substance in violation of Health & Safety Code Section 11379. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant transported for sale a controlled substance; [¶] 2. The defendant knew of its presence; [¶] 3. The defendant knew of the substance's nature or character as a controlled substance; [¶] 4. When the defendant transported the controlled substance, he intended to sell it or that someone else sell it; [¶] AND [¶] 5. The controlled substance was in a usable amount."

19

such matters as the quantity, packaging and normal use of an individual; on the basis of such testimony convictions of possession for purpose of sale have been upheld.' (*People v. Newman* (1971) 5 Cal.3d 48, 53.) Thereafter, it is for the jury to credit such opinion or reject it." (*Harris*, at pp. 374-375.)

**B. Analysis**

In the instant case, deputy sheriff Cory Drost testified as an expert for the People regarding the items recovered from the traffic stop of Ohlinger on April 26. Deputy Drost opined Ohlinger transported the methamphetamine for sale based on the "totality" of the circumstances, including the digital scale found in the trunk of Ohlinger's vehicle; and his possession of 11.2 grams of methamphetamine (including packaging), $570, consisting primarily of $20 bills, and a firearm.

As to the firearm, Deputy Drost noted it was another important indicator of illegal drug sales because such activities are "inherently dangerous, whether it be from a consumer trying to rob the individual for their product, their supply, or their proceeds." Also indicative that Ohlinger transported the methamphetamine for sale was the lack of any "consumption device" that Deputy Drost would have expected to find on Ohlinger or in his vehicle if the drug was for personal use.[14]

Based on the physical evidence and Deputy Drost's expert testimony, we conclude the jury was provided with reasonable, credible, and solid evidence from which it could find beyond a reasonable doubt that Ohlinger transported methamphetamine for sale. (See *Harris*, *supra*, 83 Cal.App.4th at p. 374.)

---

[14] Deputy Drost noted that through the course of investigation, he interviewed Ohlinger who denied the two hypodermic needles found inside the Camaro belonged to him, while admitting the methamphetamine was his.

20

Ohlinger nonetheless contends this evidence is insufficient to support his conviction on count 7 because he stated during a police interview that he did not sell illegal substances including methamphetamine; and because the evidence is consistent with his "job of raiding grow houses," as opposed to selling illegal substances.

These contentions by Ohlinger amount to an invitation to reweigh the evidence, which, as a court of review, we cannot and will not do. (See *Zamudio*, *supra*, 43 Cal.4th at p. 358; *Taylor*, *supra*, 119 Cal.App.4th at p. 639.) As we have already explained, substantial evidence supports the jury's finding that Ohlinger transported the methamphetamine for sale. (See Health & Saf. Code, § 11379, subds. (a), (c).) We thus reject this claim of error.

### III. Sentencing Errors under Former Section 654

Ohlinger contends the court erred in imposing a term on count 6, possession of methamphetamine while armed (Health & Saf. Code, § 11370.1, subd. (a)), while also imposing a term on count 7, transportation of methamphetamine for sale (*id*, § 11379, subds. (a), (c)), because both counts involve possession of the same 11.2 grams of methamphetamine. Ohlinger thus contends one of these terms should have been stayed under *former*[15] section 654, subdivision (a). The People agree, as do we. (See *People v. Jones* (2012) 54 Cal.4th 350, 358 (*Jones*) [former section 654 "prohibits multiple punishment for a single physical act that violates different provisions of law"].)

---

15  As discussed *post*, effective January 1, 2022, section 654, subdivision (a) no longer requires a trial court to sentence a defendant to the longest potential term of imprisonment for an act or omission that is punishable in different ways by different provisions of the law.

Moreover, Ohlinger was sentenced to separate terms on count 1, possession of a firearm by a felon (§ 29800, subd. (a)(1)), and on count 6, based on possession of the same firearm. (See *Jones*, *supra*, 54 Cal.4th at p. 370 [" 'single possession . . . of a single firearm on a single occasion may be punished only once under [former] section 654' "].) Ohlinger therefore contends he may be punished for counts 1 or 6, but not both. The People agree, as do we.

Ohlinger also contends the court erred in imposing concurrent two-year sentences on count 2, possession of a firearm as a felon (§ 29800, subd. (a)(1)), and on count 5, possession of live ammunition as a felon (inside the same firearm) (§ 30305, subd. (a)(1)), as each count was based on the same shotgun found in the trunk of Ohlinger's vehicle when he was stopped on April 26. The People agree, as do we, that one of the concurrent terms should have been stayed. (See *Jones*, *supra*, 54 Cal.4th at p. 353 [noting concurrent sentences, like consecutive sentences, constitute multiple punishment and are " 'precluded by [former] section 654 . . . because the defendant is deemed to be subjected to the term of both sentences although they are served simultaneously' "].)

### IV. Supplemental Briefing

The parties filed supplemental briefs addressing several changes to the law effective January 1, 2022, which they agree are applicable in this case. We address these new laws, and the convictions affected, in seriatim.

### A. Assembly Bill No. 333

Section 186.22 provides for enhanced punishment when a defendant is convicted of an enumerated felony committed "for the benefit of, at the direction of, or in association with any criminal street gang." (Former

§ 186.22, subd. (b)(1).) As noted above, Ohlinger's judgment included 10 enhancements (counts 1-9 and 18) under this law.

Effective January 1, 2022, Assembly Bill No. 333 made significant modifications to section 186.22—it amended the definitions of "criminal street gang" and "pattern of criminal gang activity," and clarified the evidence needed to establish whether an offense benefits, promotes, furthers or assists a criminal street gang. Under the former law, a "criminal street gang" was defined as "any ongoing organization, association, or group of three or more persons . . . whose members *individually or collectively* engage in, or have engaged in, a pattern of criminal gang activity." (Former § 186.22, subd. (f), italics added.) Assembly Bill No. 333 narrowed the definition to "an ongoing, organized association or group of three or more persons . . . whose members *collectively* engage in, or have engaged in, a pattern of criminal gang activity." (See Stats. 2021, ch. 699, § 3; current § 186.22, subd. (f), italics added.)

Under the former law, for "pattern of criminal gang activity" the prosecution needed to prove "only that those associated with the gang had committed at least two offenses from a list of predicate crimes on separate occasions within three years of one another." (*People v. Sek* (2022) 74 Cal.App.5th 657, 665, citing former § 186.22, subd. (e).) Assembly Bill No. 333 made several changes to this definition. "First, the predicate offenses now must have been committed by two or more 'members' of the gang (as opposed to any persons). (§ 186.22, subd. (e)(1).) Second, the predicate offenses must be proven to have '*commonly* benefited a criminal street gang.' [Citation.] Third, the last predicate offense must have occurred within three years of the date of the currently charged offense. [Citation.] Fourth, the list of qualifying predicate offenses has been reduced. [Citation.] And fifth, the

23

currently charged offense no longer counts as a predicate offense. (§ 186.22, subd. (e)(2).)" (*People v. E.H.* (2022) 75 Cal.App.5th 467, 477-478 (*E.H.*).)

Moreover, Assembly Bill No. 333 now requires the prosecution to prove the benefit derived by the gang from the predicate and current offenses is " 'more than reputational.' " (Stats. 2021, ch. 699, § 3; § 186.22, subd. (g) [providing in part: "Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant."].)

In addition to these substantive changes to section 186.22, Assembly Bill No. 333 added section 1109. As relevant here, subdivision (a) of section 1109[16] requires the trial court to bifurcate the trial of any gang enhancements upon the request of the defendant.

As noted, the parties agree, as do we, that, with the exception of section 1109, Assembly Bill No. 333 retroactively applies in this case because

---

[16]    Section 1109, subdivision (a) provides: "If requested by the defense, a case in which a gang enhancement is charged under subdivision (b) or (d) of Section 186.22 shall be tried in separate phases as follows: [¶] (1) The question of the defendant's guilt of the underlying offense shall be first determined. [¶] (2) If the defendant is found guilty of the underlying offense and there is an allegation of an enhancement under subdivision (b) or (d) of Section 186.22, there shall be further proceedings to the trier of fact on the question of the truth of the enhancement. Allegations that the underlying offense was committed for the benefit of, at the direction of, or in association with, a criminal street gang and that the underlying offense was committed with the specific intent to promote, further, or assist in criminal conduct by gang members shall be proved by direct or circumstantial evidence."

24

Ohlinger's judgment of conviction is not yet final.[17] (See *Estrada, supra,* 63 Cal.2d at p. 744; *E.H., supra,* 75 Cal.App.5th at p. 478; see also *People v. Lopez* (2019) 42 Cal.App.5th 337, 341 (*Lopez*) [under established law, we "assume, absent evidence to the contrary, that the Legislature intended an 'amended statute to apply to all defendants whose judgments are not yet final on the statute's operative date' "].)

Moreover, because newly amended section 186.22 contains new elements that were "never tried" to the jury, we conclude the proper remedy is to remand and give the People an opportunity to retry the gang enhancements. (See *E.H., supra,* 75 Cal.App.5th at p. 480; see also *People v. Eagle* (2016) 246 Cal.App.4th 275, 280 ["When a statutory amendment adds an additional element to an offense, the prosecution must be afforded the opportunity to establish the additional element upon remand."]; *People v. Figueroa* (1993) 20 Cal.App.4th 65, 72 ["Where, as here, evidence is not introduced at trial because the law at that time would have rendered it irrelevant, the remand to prove that element is proper and the reviewing court does not treat the issue as one of sufficiency of the evidence."].)

**B. Assembly Bill 518**

At the time of sentencing, former section 654, subdivision (a) required that a defendant who committed an act punishable by two or more provisions of law be punished under the provision that provided for the longest possible term. (Stats. 1997, ch. 410, § 1.) Effective January 1, 2022, Assembly Bill No. 518 (2021-2022 Reg. Sess.) amended section 654, subdivision (a) to permit

_____

17    Although the parties agree the new evidentiary provisions in Assembly Bill No. 333 retroactively apply to Ohlinger's case, they did not address whether section 1109's new procedural rules are also retroactive. As such, and given our decision to remand, we find it unnecessary to address this issue, and offer no opinion regarding its resolution in this case.

25

an act or omission punishable under two or more provisions of law to "be punished under either of such provisions." (§ 654, subd. (a); Stats. 2021, ch. 441, § 1.) Thus, under newly amended section 654, a trial court now has the discretion to punish a defendant under any of the applicable laws.

As noted, the parties also agree, as do we, that Assembly Bill No. 518 retroactively applies in this case. (See *Estrada*, *supra*, 63 Cal.2d at p. 744; *E.H.*, *supra*, 75 Cal.App.5th at p. 478; *Lopez*, *supra*, 42 Cal.App.5th at p. 341.)

As we previously noted, the trial court erred in not staying under former section 654, subdivision (a) either the term for count 6 (Health & Saf. Code, § 11370.1, subd. (a)) or the term for count 7 (*id.*, § 11379, subd. (a)) because both counts involved possession of the same 11.2 grams of methamphetamine. Similarly, the trial court also erred by not staying either the term on count 6 or the term on count 1 (§ 29800), inasmuch as both involved possession of the same gun.

Under newly amended section 654, subdivision (a), the trial court will have the discretion to impose a one-year sentence on count 6 in lieu of the two-year sentence on counts 1 or 7. As such, the case should be remanded for the trial court to exercise its discretion to determine which of Ohlinger's sentences should be stayed pursuant to revised section 654, under the authority granted by Assembly Bill No. 518.

### C. Assembly Bill No. 124 and Senate Bill No. 567

Assembly Bill No. 124 also became effective January 1, 2022. (Stats. 2021, ch. 695, § 5.3; Stats. 2021, ch. 731, § 1.3.) Among other changes, Assembly Bill 124 sets a presumption that the trial court "shall order imposition of the lower term if any of the [enumerated circumstances] was a contributing factor in the commission of the offense." (§ 1170. subd. (b)(6).) These circumstances include when the "person has experienced psychological,

26

physical, or childhood trauma, including but not limited to, abuse, neglect, exploitation, or sexual violence." (*Ibid.*; Stats. 2021, ch. 695, § 5.3.)

Here, the trial court imposed the upper term of five years on count 18, second degree robbery.[18] Ohlinger contends he is entitled to the benefit of Assembly Bill No. 124 because the "record suggests childhood trauma," which he further contends should be addressed on remand inasmuch as "no probation report was prepared in this case"; and therefore, "no social history" of Ohlinger was considered by the trial court at his sentencing.

As noted, the People also concede Assembly Bill No. 124 is retroactive. We agree with the parties. (See *Estrada, supra,* 63 Cal.2d at p. 744; *E.H., supra,* 75 Cal.App.5th at p. 478; *People v. Flores* (2022) 73 Cal.App.5th 1032, 1038 [concluding Assembly Bill No. 124 retroactively applies to the defendant and remanding for resentencing]; *Lopez, supra,* 42 Cal.App.5th at p. 341.)

Senate Bill No. 567, effective January 1, 2022, made other changes to section 1170. This new law makes the middle term the presumptive sentence when a "judgment of imprisonment is to be imposed and the statute specifies three possible terms." (See Stats. 2021, ch. 731, § 1.3, adding § 1170, subd. (b)(1), (2).) It further modified section 1170, subdivision (b)(2) to require that the circumstances in aggravation be found true beyond a reasonable doubt or be stipulated to by the defendant; and that, with certain limited exceptions, at the request of the defendant the trial on the circumstances in aggravation be bifurcated from the trial of the charges and any enhancements.

---

18    The court (without the benefit of the new law) explained it imposed the upper term because the robbery "was a well-planned and coordinated offense that was committed with a cold participant. The evidence indicates that this was an ongoing course of action by the defendant and [other] participants."

27

As was the case with Assembly Bill Nos. 333, 518, and 124, the parties agree Senate Bill No. 567 retroactively applies to Ohlinger's judgment, as do we. (See *Estrada*, *supra*, 63 Cal.2d at p. 744; *E.H.*, *supra*, 75 Cal.App.5th at p. 478; *Lopez*, *supra*, 42 Cal.App.5th at p. 341.) On remand, the court may exercise its discretion in sentencing Ohlinger under count 18, as provided in newly amended section 1170.

Finally, we note the general rule that on remand, the trial court may revisit all of its prior sentencing decisions. (See *People v. Valenzuela* (2019) 7 Cal.5th 415, 424-425 ["the full resentencing rule allows a court to revisit all prior sentencing decisions when resentencing a defendant"]; accord, *People v. Buycks* (2018) 5 Cal.5th 857, 893 [under the full resentencing rule, when part of a sentence is stricken, a remand for a full resentencing is appropriate to allow the trial court to exercise its sentencing discretion in light of the changed circumstances].) However, we take no position on how the trial court should exercise its discretion when resentencing Ohlinger.

## DISPOSITION

Ohlinger's convictions on count 18 for robbery and on count 7 for transportation of methamphetamine for sale are affirmed. We reverse the true findings on the gang enhancements (counts 1-9 and 18) and remand to give the People the opportunity, if they so choose, to retry the enhancements under newly enacted Assembly Bill No. 333.

In addition, we vacate Ohlinger's sentences on counts 1, 6, 7, and 18. The trial court is directed to resentence Ohlinger on these counts in accordance with newly enacted Assembly Bill Nos. 518 and 124, and Senate Bill No. 567. The trial court is further directed to stay under section 654 one of the two-year concurrent sentences imposed on counts 2 and 5, which involved the same shotgun containing live ammunition.

In all other respects we affirm the judgment.


HALLER, J.

WE CONCUR:


HUFFMAN, Acting P. J.


O'ROURKE, J.